580 So.2d 699 (1991)
Eve BOURGEOIS and David Elliott
v.
Val ROUDOLFICH, Champion Insurance Company, and Allstate Insurance Company.
No. 90-CA-830.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 1991.
Patricia D. Miskewicz, Clyde A. Ramirez, New Orleans, for plaintiff/appellant.
Stephen N. Elliott, Lisa C. Winter, Metairie, Barbara Stavis Wolf, New Orleans, for defendants/appellees.
Before GRISBAUM and WICKER, JJ., and FINK, J., pro tempore.
WICKER, Judge.
David Elliott, the plaintiff in this personal injury suit, appeals a judgment finding him forty percent at fault; awarding him damages in the amount of $4,259.39; and dismissing his claims against Empire Fire and Marine Insurance Company. The issues are Elliott's right to appeal the judgment, the apportionment of fault, and the amount of damages. We dismiss the appeal against Allstate Insurance Company and otherwise affirm the judgment.

MOTION TO DISMISS APPEAL
Allstate moved to dismiss this appeal on the grounds it had paid the judgment against it, along with judicial interest. Elliott executed and filed a Certificate of Docket Satisfaction acknowledging payment of the judgment and authorizing the clerk to cancel it from the records. Elliott admits that he has settled with Allstate. This compromise has a res judicata effect. *700 La.C.C. arts. 3071, 3078. We dismiss the appeal against Allstate Insurance Company.
Elliott and his girlfriend [now wife] Donna Reno went for a ride in his mother's [Eve Bourgeois'] car about midnight, August 8, 1986. They had picked up David's friend, Mark Burke, and were just cruising around for something to do. Reno was driving because Elliott didn't have a drivers' license. When the left front tire blew out, Reno pulled over to the side of Highway 45, a two-lane highway. The shoulder was narrow, about two or three feet wide, and sloped down into the ditch, so Reno stopped with at least half of the car still in the roadway. She explained that the car had aluminum rims and she didn't want to damage them by continuing to drive until she found a place to pull completely off the road.
Elliott and Burke got out to change the tire but were having trouble seeing because the road was so dark. Robert Verdin, a stranger, came along from the opposite direction and parked his truck so that one of the headlights shone down the side of the car, enabling the men to change the tire. They put the tire and jack into the trunk. Elliott realized he'd forgotten to get the tire iron, so he picked it up and put it in the car through the driver's side front window.
While Elliott was thus standing in the road alongside the car, Verdin pulled out into the roadway and left the scene. Val Roudolfich was coming down the road in the same direction as Elliott's car at the same time. He was temporarily blinded by Verdin's headlights and, when he could see again, saw Elliott and Burke in the road a few feet in front of him. He swerved his truck, clipping the left rear of Elliott's car and smashing his own right front quarter panel. Elliott was hit, jumped, or fell; and he was injured either by being hit by the truck or by falling to the ground.
Elliott and Bourgeois, owner of the totalled car, sued Roudolfich, alleging that his negligence and/or the negligence of Reno was the sole cause of the accident. They also sued Champion Insurance Company, Roudolfich's insurer; Empire, Roudolfich's excess insurer; and Allstate, Bourgeois' insurer. Elliott settled with Roudolfich and Champion prior to trial, dismissing these defendants but reserving his rights against the remaining defendants, specifically Empire and Allstate. Empire then moved for summary judgment on the grounds that Elliott's dismissal of Champion, the primary insurer, released it as excess insurer from further liability. Empire's motion was denied.
A twelve-person jury heard the case and unanimously assessed forty percent of the fault to Elliott, forty percent to Reno, and twenty percent to Roudolfich. It awarded $5,000.00 for past, present, and future pain and suffering and $7,780.97 for past, present, and future medical expenses. The award was reduced by the $2,132.49 in medical expenses already paid by Allstate and by Elliott's forty percent fault, resulting in a judgment of $4,259.39. The judge gave Empire a credit of $10,000.00 for the underlying limits previously paid by Champion and dismissed the claims against Empire.
We believe the testimony supports the jury's assessment of fault and affirm it under the principles of Rosell v. ESCO, 549 So.2d 840 (La.1989). Reno stopped the car in the highway blocking about three-quarters of the lane. Elliott was standing even further in the highway next to the driver's window, and Verdin's headlight was shining in such a manner as to temporarily blind Roudolfich.

DAMAGES
Elliott had dropped out of high school when he was in the ninth grade, at least partly because of a hereditary kidney disease which caused him to miss a lot of school. At the time of the accident, he was seventeen years old; and he and Reno were living with and being supported by Bourgeois. Elliott had worked as a busboy at Shoney's and on and off with his brother as a helper in construction work. His father, a construction supervisor, had promised to get him a job when he turned eighteen. He did not, however, have a job at the time of the accident. He testified of unsuccessful *701 attempts to work since the accident, each time having to quit because of pain or dizziness.
Elliott's family drove him to the hospital after the accident with complaints of a bruised calf and a cut shoulder. Later on, he said he developed headache and neck pain unlike anything he'd ever had before. He now complains of pain, dizziness, "episodes", mood changes, and confusion. Reno and Bourgeois confirm these complaints and changes.
All objective medical tests, including CAT scan, brain scan, EEG, and MRI, have been normal. The medical issue is whether Elliott is suffering from a post-concussion syndrome which has damaged his mental and emotional functions and which can be detected only through neuropsychological testing. Two neurologists, a neurosurgeon, an orthopedist, and a psychologist testified; and the medical evidence is inconclusive.
The orthopedist, Robert A. Fleming, Jr., M.D., saw Elliott in October of 1986, two months after the accident, with complaints of neck pain, headaches, neck stiffness, and pain and swelling in the ankle. Elliott gave a history of landing on his face and hands. He found some restriction in neck motion and minimal spasm, and he thinks under ordinary circumstances this would have cleared up. He diagnosed resolving cervical sprain and prescribed analgesics and muscle relaxants. Elliott did not return.
A neurologist, Patricia Cook, M.D., treated and evaluated Elliott both before and after his accident. She first saw him in 1979 and 1980 for headaches, stomach aches, nausea and vomiting, and impaired balance. Although he was not epileptic, she treated him with dilantin because some children with recurring headaches and stomach aches respond to this drug. She referred him to a psychologist, Dr. York, because he was having difficulty in school, had a school phobia, and had recurring stomach aches. Dr. York's report indicated average intelligence with no significant learning dysfunction and educational underachievement. He wrote that Elliott was an anxious, depressed, passive, dependent boy who used some somatic complaints to deal with anxiety and loss. Dr. Cook said, "David had always had a lot of somatic complaints, multiple complaints with reference to his body and that was borne out in the psychological testing done in 1980. He gets very anxious and has a tendency to somatize." Bourgeois applied for home bound schooling for Elliott; but both Dr. Cook and Dr. York opposed this, since they felt it would only reinforce his school phobia. Dr. Cook next saw Elliott in October of 1986. He told her he had quit school in the ninth grade because he was having a lot of trouble in addition to missing school because of strep throat and mononucleosis. He gave a history of the accident and complained of headaches, neck pain, and memory loss. His examination was normal, with a slight degree of limitation in neck motion; and her diagnosis was cervical sprain and possibly cervical contusion. She thought his headaches were probably common migraine, accentuated by the accident. She treated him with a special pillow, anti-inflammatory medicine, and migraine medicine; but he had complaints about whatever medicine she put him on. Her final diagnosis was multiple somatic complaints, muscle contraction pain associated with anxiety, and post-traumatic syndrome. She concluded that the problems Elliott was having at seventeen or eighteen years of age were the same as he was having when he was eleven.
Richard Warren Levy, M.D., a neurosurgeon, examined Elliott in June of 1987 for complaints relating to his neck, shoulder, low back, and left leg. Elliott denied striking his head, so he was not looking for head injury residuals. Elliott also complained of trouble thinking, occasional visual blurring, occasional ringing in the ear, and a choking sensation. The examination was normal, except for tenderness to pressure in the back of the neck. He found no evidence of injury or disease and no neurological basis for Elliott's complaints. He suggested Elliott see eye and ear specialists if his visual and auditory problems persisted. He was looking for a nerve injury in the neck and found none. The *702 principal way to diagnose functional disability is through neuropsychological testing, and he wouldn't quarrel with the neuropsychologist's conclusions.
Another neurologist, D.C. Mohnot, M.D., has treated Elliott since March of 1988 for complaints of head and neck pain, right side numbness, forgetfulness, and confusion. He diagnosed post-traumatic headaches and neck sprain and has prescribed anti-inflammatory drugs, muscle relaxants, and drugs for pain and/or epilepsy. He believed that all Elliott's symptoms were consistent with post-concussion syndrome and were related to his accident. He felt Elliott's prognosis was fairly good and expected to be treating him for another two or three years.
Rafael Salcedo, Ph.D., a clinical psychologist with a subspecialty in neuropsychology, testified that people can have severe brain trauma although MRI's and CAT's and EEG's are normal, since these tests measure only gross deficits. He first saw Elliott three years after the accident, in October of 1989, and administered a battery of psychological tests. In some instances, he found Elliott to be functioning below what would have been expected given his age and background. He concluded Elliott had functional brain damage disability and didn't believe there would be much additional recovery. He felt if Elliott had been impaired before his accident, he would have tested impaired across the board; but this was not the case. He ruled out mental retardation and faking it, but he noted that these findings could conceivably be caused by something other than trauma. He was not privy to Elliott's school records or the results of prior testing, although he felt being able to review these would have been beneficial.
A trier of fact, be it judge or jury, must weigh expert testimony as it weighs any other evidence and is not bound by it. Comberrel v. Basford, 550 So.2d 1356 (La. App. 5th Cir.1989), writs denied 556 So.2d 1284 & 1286 (La.1990). Where findings are supported by credible evidence which furnishes a factual basis for them, we will not disturb them absent manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). We find no such manifest error in the damage award and affirm it in all respects. Since this award is less than the underlying limits of the Champion policy, Empire has no liability under its excess coverage. We do not then need to address the issue of whether Elliott's settlement with and release of Roudolfich and Champion operate to effect a release of Empire as well.
We affirm the judgment in favor of David Elliott but dismissing his claims against Empire Fire and Marine Insurance Company. We dismiss the appeal as to Allstate Insurance Company. Elliott must pay the cost of this appeal.
JUDGMENT AFFIRMED; APPEAL PARTIALLY DISMISSED.