602 So.2d 22 (1992)
SUNLAKE APARTMENT RESIDENTS
v.
TONTI DEVELOPMENT CORPORATION and United States Fidelity and Guaranty Company.
Daniel R. ROBERTS, Sr.
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY.
Robert T. TONTI, Margaret W. Tonti and Fidelity & Guaranty Insurance Underwriters, Inc.
v.
The FEDDERS CORPORATION, Glindmeyer Distributing Company, Inc. and Gerrard Raymond and/or Gerrard Raymond, Inc.
FIREMAN'S FUND INSURANCE COMPANY OF LOUISIANA
v.
TONTI DEVELOPMENT CORPORATION, Tonti Management Corporation, Robert Tonti, United States Fidelity and Guaranty Company and Fedders Corporation.
Nos. 91-CA-445, 91-CA-446, 91-CA-447, 91-CA-448.
Court of Appeal of Louisiana, Fifth Circuit.
May 15, 1992.
Rehearing Denied August 17, 1992.
*23 T. Peter Breslin, Beth Gilliam, Metairie, for plaintiffs/appellants.
John A. Stewart, Jr., Al M. Thompson, Jr., Hulse, Nelson & Wanek, New Orleans, for Gerrard Raymond, Gerrard Raymond Architect, Inc. and Continental Cas. Co., defendants/appellants.
Gregory G. Gremillion, Wade A. Langlois, III, Gretna, for State of La., Dept. of Public Safety and Corrections, Office of the State Fire Marshal, defendants/appellees.
Michael J. Power, Ansardi, Maxwell & Power, Kenner, for City of Kenner, defendant/appellee.
Before KLIEBERT, C.J., and BOWES and GRISBAUM, JJ.
KLIEBERT, Chief Judge.
This is an appeal by the plaintiffs in the original demand (hereinafter collectively "Sunlake Apartment Residents") and by defendants/third-party plaintiffs Gerrard Raymond, Gerrard Raymond Architect, Inc., and their insurer, Continental Casualty Company' (hereinafter collectively "the Raymond Group") from judgments dismissing their demands against the State of Louisiana, Department of Public Safety, Office of the State Fire Marshal, and the City of Kenner, Office of Regulatory Inspections (hereinafter collectively "Public Agencies"). The claim for damages arose out of a September 15, 1985 fire which completely destroyed the five-year-old Apartment Building No. 836 of the Sunlake Apartments in Kenner, Louisiana.
The case was previously before us on exceptions of no cause of action and motions for summary judgment. See Sunlake Apts. Resid. v. Tonti Dev. Corp., 522 So.2d 1298 (5th Cir.1988). There we reversed the trial court's rulings granting summary judgment and an exception of no cause of action directed toward the Sunlake Apartment Residents' petitions and the Raymond Group's third-party demand against the Public Agencies and remanded the case, on the grounds there were material issues of fact. After the remand the claims of the original plaintiffs against all the defendants on the main demandi.e., the Tonti Group (the owners/contractors of the apartment complex), the Raymond Group, and their insurerswere settled and the case proceeded to a bifurcated liability-only trial of the claims of the Sunlake Apartment Residents, the Raymond Group, and their insurers' subrogation claims against the Public Entities.[1]
Apartment Building No. 836 was a three-story wood-frame structure with each floor divided into multiple apartments. Although there were serious disputes as to *24 the actual cause of the fire, the fact that the fire originated in the closet containing the air-conditioning unit in Apartment No. 19, located on the second floor of Apartment Building No. 836, is uncontested. Although some walls were left standing, the fire rendered the entire building uninhabitable.
The appellants contend the Public Agencies are liable for failing to detect the absence of fire stops and draft stops in the plans and construction of Building No. 836. Fire stops are partitions made of fire-retardant material and are designed to contain a fire for a certain amount of time, depending on the material used. Draft stops are designed to prevent the spread of fire by blocking air passages. Draft stops do not contain a fire itself, but deprive it of access to air.
Here, except for the finding draft stops were required by the building code, neither group of litigants seriously contest the following findings of fact made by the trial judge:
"The Tonti interests own, constructed and manage Building 836 of the Sunlake Apartments in Kenner, Louisiana. Gerard Raymond drew and certified the plans for the entire project. Building 836 was constructed during Phase 3. The plans for said building did not provide for fire stops or draft stops in accordance with the 1973 Life Safety Code (Section 613) and the Building Code of the City of Kenner (Articles 2211, 3101, 3105, 3205, 2526). Both were in effect at the time of drafting of plans, application for permits, construction and fire. The plans were submitted for approval, on behalf of the owners, to the State Fire Marshal and were approved, with conditions, by letter dated 12/28/78. An application for a building permit was made to the City of Kenner. Three inspections were required and made. The last two, before closing and final, were made on 7/17/80 and 10/6/80, respectively. The fire took place on September 15 and 16, 1985. The residents suffered property damages in the fire."
Following the "duty-risk analysis" used in deciding tort liability, the trial judge concluded the Residents and the Raymond Group had failed to meet the burden of proof that the Public Agencies had a specific duty to the particular residents (as opposed to a duty to the public in general) or the Raymond Group. Additionally, he concluded that they had not proven that "but for" the Public Agencies' action or inaction, their damages would not have been sustained. On that basis and for the reasons hereinafter stated, we affirm the trial court's judgment.
On appeal, the Residents and the Raymond Group assert the trial judge erred in finding the Public Agencies owed no duty to the particular residents here. They also contend the judge erred in his findings that the negligence of the State's and the City's employees was not a cause-in-fact of the damages. Additionally, they contend the judge erred in admitting into evidence the deposition of Donald Belles, an expert fire protection engineer, in lieu of requiring his live testimony.
We address first the evidentiary issue, i.e., whether the trial judge erred in admitting Donald Belles' deposition into evidence. Belles, a nationally-recognized expert in fire protection, is a resident of Tennessee; his deposition had been taken in Tennessee during the discovery phase of the case, at the behest of the defendant Fedders Corporation, which was dismissed from the case following settlement.
Prior to trial the State indicated it intended to use Belles' deposition. Belles' personal appearance would have required the State to pay his travel expenses and other fees. The appellants objected, via motion in limine, on the grounds that Belles was willing and available to appear at the trial. The judge denied the motion in limine and admitted the deposition.
The appellants now argue the court erred. In support of the argument they cite the hearsay rules of the Code of Evidence, which provides that former testimony generally may be admitted only if the declarant is unavailable as a witness. LSA-C.E. art. 804(B)(1). Art. 804 defines *25 "unavailable as a witness" as "when the declarant cannot or will not appear in court and testify," including situations in which the declarant "is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means." LSA-C.E. art. 804(A)(5). The appellants contend the appellees could have procured Belles' attendance by the "reasonable means" of paying his expenses to travel to Louisiana and, therefore, the deposition should be ruled inadmissible.
The appellees, however, point out that admissibility of a deposition into evidence at trial is governed by the Code of Civil Procedure. LSA-C.C.P. art. 1450 provides that a deposition may be used at trial if "the witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition * * *." LSA-C.C.P. art. 1450(A)(3)(b).
The appellees assert the witness was not subject to the subpoena power of the court and his fee for testifying would have totalled $2,500. In addition, they note, Belles' deposition had been taken "for all purposes" and the attorneys for both groups of appellants were present at the deposition, while counsel for the State was not.
We conclude there is no merit to this assignment of error. A trial court is vested with great latitude and broad discretion in making the determination as to the unavailability of a witness for the purpose of receiving his deposition into evidence. Geisler v. United States Fidelity and Guar., 498 So.2d 292 (4th Cir.1986).
Further, in the official Comments to Code of Evidence Article 804, Exception (B)(1), it is noted in Comment (d) that the admissibility of depositions continues to be governed by the Code of Civil Procedure. Belles was an out-of-state resident; the objecting parties, through their attorneys' presence at the deposition, had a chance to examine Belles thoroughly; his testimony was favorable in many respects to the appellees' case and they have failed to show any prejudice that outweighs the probative value of the testimony.
Accordingly, we hold the trial court did not err in admitting the Belles deposition. See Snell v. United Parcel Services, Inc., 543 So.2d 52 (1st Cir.1989), writ denied 545 So.2d 1040; Anderson Estate v. Charity Hosp. of La., 537 So.2d 1218 (4th Cir.1989), writ denied 539 So.2d 633; Hebert v. Brazzel, 393 So.2d 135 (3rd Cir.1980), affirmed 403 So.2d 1242.
Next we consider the liability issues. The gravamen of the appellants' claims against the Public Agencies is that the Public Agencies approved the architect's plans for Building No. 836 without noting the omission of fire stops and draft stops and, without these stops, the fire spread faster than it normally would have, preventing the tenants and firefighters from extinguishing it in time to prevent or reduce the amount of property loss.
In order to determine liability in negligence cases our courts have adopted the duty-risk analysis, which considers the following factors:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) What, if any, duties were owed by the respective parties?
(3) Were the requisite duties breached?
(4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
See Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). Further, where public agencies are the defendants, as here, a governmental entity is exempt from liability for the negligence of its officers or employees, if it is a duty owed to the general public as opposed to a duty owed to an individual plaintiff. Dufrene v. Guarino, 343 So.2d 1097 (4th Cir.1977), writ denied 343 So.2d 1068. See also, Stewart v. Schmeider, 386 So.2d 1351 (La.1980); Lott v. Landor, 452 So.2d 1266 (1st Cir.1984), writ denied 458 So.2d 119, 458 So.2d 125; Sunlake Apts. Resid. v. Tonti Dev. Corp., supra.
*26 Although the application of the duty factor of duty-risk analysis and of the public immunity doctrine were seriously disputed and extensively briefed by all the litigants, in view of our findings and holding on the cause-in-fact element of the duty-risk analysis, we need not and do not discuss or rely on the lack of a duty or an immunity factor under the public duty doctrine to affirm the trial court's judgment.
Moreover, since the Supreme Court stated in Fowler v. Roberts, 556 So.2d 1, 7 (La.1989), "The determination whether a particular duty should be imposed on a particular governmental agency is a policy question," we find no overriding policy consideration to impel us to impose on these governmental entities a duty that not only would entail potential liability extending into the distant future and enormous financial impact on the public treasury, but also would in whole or in part relieve architects, contractors and building owners of their liability for faulty construction or construction in violation of fire and building codes and thus make the public treasury an insurer for their negligence.
With respect to the cause-in-fact factor, the plaintiffs and the Raymond Group contend the trial judge erred in ruling that the Public Agencies' failure to detect, before construction or in inspection after construction, the absence of draft stops and fire stops in the plans and construction of Building 836 was not a cause-in-fact of the damage to and destruction of the building. They argue the evidence "clearly preponderates" that fire stops and draft stops would have "greatly reduced and/or impaired the rapid spread of the fire."
Cause-in-fact is a "but for" test, which asks whether the injuries would not have occurred "but for" the defendant's substandard conduct. Fowler v. Roberts, supra. Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm. Socorro v. City of New Orleans, supra.
To be considered a cause-in-fact of the harm to the plaintiff, the defendant's negligent conduct must be a substantial and necessary antecedent to the harm produced. Guillot v. Sandoz, 497 So.2d 753 (3rd Cir.1986), writ denied 501 So.2d 217. Cause-in-fact is purely an issue of fact and the trial judge may draw such inferences from the evidence presented as are in accordance with logic and experience; his determination of factual issues is entitled to great weight and cannot be disturbed unless clearly wrong. Id.
Judgment in lawsuits is based not on scientific certainty but rather on a preponderance of the evidence; that is, the evidence must show it is more probable than not that the harm was caused by the defendant's conduct. Lyons v. Parish of Jefferson, 425 So.2d 955 (5th Cir.1983), writ denied, 430 So.2d 97. Inferences regarding causation are within the realm of the fact-finder, who may choose to draw them or refuse to draw them, depending on the evaluation and weight accorded to competing and sometimes conflicting circumstances. Id.
The Residents and the Raymond Group rely on the testimony of fire experts to support their contentions that, "but for" the actions or inaction of the Public Agencies, the fire could and would have been controlled before the damage became extensive.
Although both experts, George Hero and Donald Belles, blamed the lack of stops for the total destruction of the building and asserted the fire could have been limited to one or two apartments had stops been installed during construction, the record does not supply us with the fundamental facts on which those experts had to rely to develop their theories and opinions.
More specifically, the record contains no direct evidence regarding (1) the start of the fire, its progress and its eventual extinguishment, or (2) the time spans involved in reporting it, in the arrival of the fire department, in evacuating the residents, in the progress of the fire through the building, and in the time it took firemen to begin fighting the fire. The only direct mention is a statement by one of the tenants, Charles Crowder, that the fire started around 3:00 a.m. All other references to *27 the time frame of the events are made in leading questions by counselwhich are not evidenceor in comments by the experts, apparently taken from depositions or statements outside the record.
George Hero, the Raymond Group's expert, is an electrical engineer who stated his expertise is in the origin and causes of fires and that he originally was hired by the Tonti defendants to determine the cause of the fire. However, over some objections he was tendered by the Raymond Group counsel and accepted by the trial judge as an expert in "Cause, origin and the spread of fires."
Hero stated that during his investigation he had informal conversations with persons on the site, that he later read the statements of the tenants in Apartment Nos. 19, 20 and 29, and he talked to a firefighter who was on the scene and who described to Hero how the fire spread.
Asked his familiarity with weather conditions the night/morning of the fire, he said he understood there had been a "fairly strong north wind" at the time the fire started on the north wall of the building.
On cross-examination, Hero admitted that when he first investigated the scene of the fire his purpose was to find the origin of the fire. He did not look for the presence or absence of fire stops at that time; he took photographs and made a few handwritten notes. Although his notes mentioned the fire had a rapid spread and it spread through the joists, he was not looking at the construction of the building.
He admitted he stated in his deposition that he did not know the specific time the fire took to spread, that it was a fairly rapid fire, but no one was injured"Everyone was able to escape so maybe it was not too fast."
The State presented the deposition testimony of Donald Belles, a fire protection engineer and a nationally-known expert in fire protection. His testimony in many respects agreed with Hero's; both noted that fire normally travels verticallyupward, as the gases riseand that the presence of fire stops and draft stops would for a while contain it to a smaller area.
According to Belles' testimony, there were factors other than the lack of fire or draft stops that caused or contributed to the rapid spread of the fire, namely:
(1) It was constructed of wood and by the nature of its design would have a structural stability of only 10 to 12 minutes;
(2) It was oversized for the construction type and had no special protection or structural members to enable it to resist the effects of fire;
(3) The plans showed certain fire safety devices that were changed in construction of the building: e.g., instead of 20-minute fire door assemblies with self-closing devices, non-self-closing wooden hollow-core doorswhich burn through in four to six minuteswere installed; and although the building plans showed manual fire alarms, they were not installed;
(4) A foam plastic sheath insulation was used without being separated from occupied spaces by an appropriate thermal barrier such as gypsum board.
Belles opined these violations all caused or contributed to the degree of destruction caused by the fire.
In response to cross-examination, he indicated he had made no calculations regarding the response time of the fire department, that he had noted there were complaints regarding the fire department's response time, and that in his experience it is normal for fire victims to complain about the time it takes the fire department to respond. Asked further whether he placed "any significance on the testimony concerning the ineffectiveness of four fire extinguishers to effectively stop the fire," he responded, "No."
He also stated he was not surprised that the local building inspectors issued a permit for a building that violated their code, because it happens regularly: "The building department relies on the design of their professionals.... Many of the people in the local building department are poorly prepared and overworked, and they should not be relied upon to see that the architect and engineers have designed the building *28 properly. It's their professional responsibility to do it."
In his opinion the lack of fire stops was a "substantial factor" in the spread of the fire, but he noted that discussion of fire or draft stops in this type of building is "academic" beyond the 10- to 15-minute period "because the building frame wasn't protected in any special way against fire effects.... The maximum duration that would be consistent with the type of construction used would be something within the 10- to 15-minute range."
In our view the evidence here supports the trial court's finding that the Public Agencies' actions or non-actions were not a cause-in-fact of the injuries. The appellants were required to prove that if the State Fire Marshal or the Kenner Department of Inspections had noticed the architect's omission of the stops and had notified the architect or owner or contractor, those parties would have made the necessary changes to incorporate the stops into the building and that such incorporation would have retarded the fire sufficiently to allow fire fighting efforts to prevent or reduce the damage sustained.
Instead, the evidence indicates the owner/contractor failed to include the stops, despite his knowledge they were required; there is no evidence he would have included the stops had they been on the plans, since he omitted them in the other phases in which they were shown on the plans; and the architect admittedly had the responsibility for making sure the stops and other code requirements were included in the plans.
The experts' stated conclusionthat the absence of draft stops and fire stops accelerated the destruction of the buildingwas presented to the trial judge in an evidentiary vacuum. He did not have before him the facts on which these experts relied in making their assessments regarding duration of the spread of the fire.
"A trier of fact, be it judge or jury, must weigh expert testimony as it weighs any other evidence and is not bound by it." Bourgeois v. Roudolfich, 580 So.2d 699, 702 (5th Cir.1991). "The weight to be given to an expert's testimony is largely dependent on his qualifications and the facts on which his opinion is based. * * * An expert's opinion has no value if the facts on which it is predicated are not substantiated by the record." Patterson v. Meyers, 583 So.2d 79, 84 (4th Cir.1991).
For the foregoing reasons, the judgment of the district court is affirmed. Costs of this appeal are assessed against the appellants.
AFFIRMED.
BOWES, Judge, concurring.
I agree with the final result reached by the majority in this difficult opinion regarding liability, but not with all of the reasoning contained therein and particularly the discussion about the "Public Duty Doctrine."
NOTES
[1] According to the State's brief, the 35 Residents in this case have collected approximately $900,000 in settlement payments. However, the total figures of the plaintiffs' settlements are not in the record before us. The record does establish that the Tonti Group, the apartment owners/contractors, received more than $442,000 in settlement from the Raymond Group.