733 So.2d 679 (1999)
Howard J. DELAHOUSSAYE
v.
Cynthia MADERE, et al.
No. 98-CA-1033.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1999.
*681 Christopher J. Fransen, A. Remy Fransen, Jr., Fransen & Hardin, New Orleans, Louisiana, Attorney for Plaintiff/Appellant.
Raymond G. Hoffman, Jr., Metairie, Louisiana, Attorney for Defendant/Appellee.
Panel composed of Judges CHARLES GRISBAUM, Jr., EDWARD DUFRESNE, and THOMAS F. DALEY.
DALEY, Judge.
This is an appeal by the plaintiff, Howard Delahoussaye, in this personal injury lawsuit, which stems from a multi car accident. For reasons assigned, we affirm in part and reverse in part.

FACTS:
On November 23, 1993, Howard Delahoussaye, traveling northbound on Power Boulevard, was stopped behind a car driven by Ro Ann Meyer. Ms. Maureen Belcher, driving immediately behind Mr. Delahoussaye, had also come to a stop. Ms. Belcher was struck in the rear by a car driven by Cynthia Madere, which propelled her car into Mr. Delahoussaye's car. Mr. Delahoussaye's car was pushed into the rear of Ms. Meyer's car.
Mr. Delahoussaye filed suit against the following parties:
(1) Ms. Meyer and her insurer, Hartford Insurance Company;
(2) Ms. Belcher and her insurer, State Farm Mutual Automobile Insurance Company;
(3) Ms. Madere and her insurer, State Farm Mutual Automobile Insurance Company;
(4) Liberty Mutual Insurance Company, (Liberty Mutual), which provided uninsured/underinsured motorist coverage for the vehicle Mr. Delahoussaye was driving at the time of the accident;
(5) Prudential Property & Casualty Insurance Company, (Prudential), the uninsured/under insured motorist *682 carrier on the car Mr. Delahoussaye's usually drives.[1]
Prior to trial, Mr. Delahoussaye settled with State Farm in its capacity as Ms. Belcher's insurer for $90,000.00. Ms. Belcher had a $100,000.00 policy with State Farm. He also settled with State Farm as Ms. Madere's insurer for the $10,000.00 policy limit. Ms. Meyer and Hartford were dismissed from the suit. Prudential denied coverage, claiming the car which plaintiff was driving was a rental car, and uninsured motorist coverage was only extended to the named insured, a spouse, and a resident relative. Prudential concluded that since Mr. Delahoussaye was neither, there was no coverage. Liberty Mutual made a non-binding tender of $40,000.00 to plaintiff pursuant to McDill v. Utica Mutual Insurance Co., 475 So.2d 1085 (La.1985). On January 22 and 23, 1998, trial was held against Liberty Mutual and Prudential.
At trial, Mr. Delahoussaye testified that he was stopped in traffic at the bottom of the Interstate 10 overpass on Power Boulevard, when the vehicle he was driving was struck in the rear. He felt two impacts, with the first being the most severe. At the time of the accident, Mr. Delahoussaye was living with Ms. Anita Fontenot. Ms. Fontenot owned a 1992 Lincoln Continental Town Car, which was insured with Prudential. Although Ms. Fontenot is the named insured on the policy, Mr. Delahoussaye was listed as a licensed driver residing at the residence of the insured. On November 22, 1993, Mr. Delahoussaye brought Ms. Fontenot's Town Car to Lamarque Lincoln Mercury for repairs. He obtained 1993 Town Car from Lamarque to use while the Fontenot car was being serviced. Mr. Delahoussaye explained that he and Ms. Fontenot had previously purchased cars from Lamarque and part of the dealership agreement was that another Town Car would be provided for the customer's use when their own car was being serviced. Although he never paid Lamarque for the use of the 1993 Town Car, he signed a document entitled "rental agreement," when obtaining the car he was driving at the time of the accident.
Ms. Dee Sattler, an employee of Lamarque Lincoln Mercury, testified that when Ms. Fontenot's car was brought in for warranty work, a loaner car was given to Mr. Delahoussaye to use. She filled out the document entitled "rental agreement" in order for Mr. Delahoussaye to use the loaner car. Mr. Delahoussaye was not billed for the use of this car; rather, Lamarque was reimbursed by Ford Motor Company.
Deputy Alan Welch of the Jefferson Parish Sheriffs Office testified that he investigated the accident of November 23, 1993. He concluded that Ms. Madere was at fault in causing the accident.
Ms. Madere was called by the plaintiff to testify. She stated that as she was coming down the overpass, she slammed on her brakes when she noticed the vehicles in front of her were stopped. She slid into Ms. Belcher's vehicle, which was stopped, but she was unsure if the Belcher vehicle struck plaintiffs car at the same time.
Ms. Belcher's deposition was introduced into evidence. She testified that she was stopped at the time she was struck by the Madere vehicle. This impact pushed her into Mr. Delahoussaye's car.
Mr. Delahoussaye testified that he experienced a "stiff feeling" in his back at the scene of the 1993 accident. The day after the accident, Mr. Delahoussaye sought treatment from Dr. William Berman, a chiropractor, for neck and back pain. He also sought treatment from Dr. Bruce Razza, an orthopedist, shortly after the accident. Mr. Delahoussaye was treated with *683 massage therapy, pain medications, antiinflammatory medications, and exercises for complaints of pain in the thoracic and lumbar areas of his back. He also received nerve blocks in his back. He spent a week at the Florida Spine Institute in an attempt to obtain relief from his pain. His condition did not improve, and he developed headaches. Mr. Delahoussaye became depressed. Due to the pain and depression, he was unable to do things he had done prior to the accident, or participate in outings with Ms. Fontenot and their young daughter. In March 1996, Ms. Fontenot left Mr. Delahoussaye, ending their 18-year cohabitation.
Mr. Delahoussaye stated that he did not have problems with his thoracic and lumbar spine prior to the 1993 accident. At the time of trial, Mr. Delahoussaye stated that he continued to have severe pain in these areas. Dr. Razza recommended surgery for these complaints, but Mr. Delahoussaye explained that he was afraid of the surgery and will live without the surgery as long as he can stand the pain.
Mr. Delahoussaye testified that in 1985 he sustained injuries in another accident which resulted in him undergoing five surgical procedures on his neck. He was rendered disabled from his job as a horse trainer, but continued to attended horse races and traveled to horse sales where he bought and sold horses. Following these surgeries, he remained under the care of Dr. Razza, and Dr. Berman, for occasional pain and stiffness.
Ms. Anita Fontenot testified that she lived with Mr. Delahoussaye from May 1978 until March 1996. She stated that prior to the 1993 accident, she and Mr. Delahoussaye had a "reasonable" lifestyle. He suffered from pain in the neck and shoulders prior to the 1993 accident; however, after the 1993 accident, he suffered from low back pain and became depressed. She testified that Mr. Delahoussaye did not want to participate in activities or outings with her and their daughter. He also lost interest in horse racing and no longer attended horse sales. Ms. Fontenot was unhappy with the relationship because of Mr. Delahoussaye's lack of participation, so she left their home.
Dr. Bruce Razza, who was accepted by the court as an expert in orthopedic surgery, testified that he treated Mr. Delahoussaye following his 1985 accident. He performed anterior and posterior cervical fusions on Mr. Delahoussaye from the fourth cervical vertebrae to the second thoracic vertebrae. After recovering from these procedures, Mr. Delahoussaye suffered from neck pain caused by a muscle spasm in the trapezium, which extends from the base of the neck to the thoracic area. On November 30, 1993, Mr. Delahoussaye presented to his office stating he had been in an automobile that was struck in the rear, aggravating his neck and thoracic pain and bringing about the development of low back pain. Over time Mr. Delahoussaye's neck went back to its preaccident level; however, the thoracic and lumbar complaints increased. On January 24, 1994, an MRI was performed, which revealed a disc herniation between the seventh and eighth thoracic vertebrae, and disc herniations between the fourth and fifth lumbar vertebrae and the fifth lumbar vertebrae and the first sacral vertebrae. An electromyelogram was performed, which showed chronic denervation in both of Mr. Delahoussaye's legs at multiple levels. Mr. Delahoussaye was treated with medication, physical therapy, exercise and nerve blocks. Dr. Razza testified that these treatments have been unsuccessful and recommends that Mr. Delahoussaye undergo a two level laminectomy and fusion on his thoracic spine and a partial discectomy on his lumbar spine. He estimates these procedures would be 75% successful in relieving Mr. Delahoussaye's pain. Dr. Razza testified that although Mr. Delahoussaye probably had disc degeneration prior to the 1993 accident, the trauma of the accident caused the low back pain and exacerbated the symptoms in the neck and thoracic spine. On cross-examination, *684 Dr. Razza testified that Mr. Delahoussaye's diabetic condition partially caused the abnormal findings on the EMG, but the leg pain is caused by the disc injury.
Dr. William Berman was accepted by the court as an expert in chiropractic medicine. Dr. Berman treated Mr. Delahoussaye from 1985 until November 1993 for neck and shoulder pain, and minor pain in the mid and low back. On November 24, 1993, Mr. Delahoussaye presented to Dr. Berman's office complaining of severe cervical pain, and severe stiffness and intermittent shooting pains into his trapezium muscle following a motor vehicle accident. Dr. Berman continued to treat Mr. Delahoussaye until the time of trial. Over the course of treatment, Mr. Delahoussaye developed persistent low back pain that is unresponsive to treatment. Dr. Berman testified that from November 1992 until November 1993, Mr. Delahoussaye was treated nine times for complaints of pain. From November 1993 until November 1994, Mr. Delahoussaye was treated a total of 61 times.
Reports from Dr. Lawrence Russo, who examined Mr. Delahoussaye at the request of the defendant, were admitted into evidence. Dr. Russo reviewed previous x-rays and medical records, concluding there was extensive degeneration in the thoracic spine that preceded the accident. He stated the minimal herniations in the lumbosacral spine did not necessitate surgery. Dr. Russo concluded the abnormalities shown on the EMG were due solely to diabetes.
At the conclusion of trial, the trial judge found that Ms. Madere was solely at fault in causing the accident. The court held that it erred in allowing testimony regarding the intent of the rental agreement between Mr. Delahoussaye and Lamarque and found that the car being driven by Mr. Delahoussaye was a rental car. The trial court went on to find that because the car was a rental car, pursuant to the Prudential policy language, uninsured motorist coverage extended only to the named insured or a resident relative, "i.e. someone who lives in the same household as the insured and is related to the insured by blood, marriage, adoption or is a ward or foster child." Since Mr. Delahoussaye did not meet these requirements, his suit against Prudential was dismissed. Regarding Mr. Delahoussaye's injuries, the trial court found that much of Mr. Delahoussaye's medical problems were "clouded and/or complicated by his diabetes condition for which defendant is not liable." The trial court further held the medical evidence failed to prove that all medical expenses were related to the accident. The court found that based on the testimony of plaintiff and Dr. Razza, plaintiff will not incur any future surgical expenses because he will never agree to have surgery. Finally, the trial court found in favor of plaintiff and against Liberty Mutual, awarding $50,000.00 in past, present, and future medical expenses, and $75,000.00 for past, present, and future pain and suffering. Liberty Mutual was given a $10,000.00 credit for the settlement with State Farm as Madere's insurer. After the judgment was rendered, plaintiff settled with Liberty Mutual for $40,000.00, in addition to the $40,000.00 that Liberty Mutual had previously tendered. Hence, Liberty Mutual is not a party to this appeal.

DISCUSSION:
On appeal, plaintiff contends the trial court erred in finding there was no coverage under the Prudential policy and dismissing his claim.
The Prudential policy was introduced into evidence. The policy consists of four parts: Part 1Liability, Part 2Medical Payments, Part 3Collision & Comprehensive, and Part 4Uninsured Motorists. In Part 4 the section entitled "who is insured" reads:

You and a resident relative are insured while using your car or a substitute car covered under this part. *685 Other people are insured while using your car or a substitute car covered under this part if you give them permission to use it. They must use the car in the way you intended.

Under the section entitled "what cars are covered," a "substitute car" is defined as:
If a car covered under this part breaks down, is being serviced or repaired, or is stolen or destroyed, we will cover a car you borrow temporarily (with the owner's permission) while your car is being repaired or replaced. This car cannot be owned by you or a household resident. The substitute car has the same coverage as the car that is out of service.
Based on this language, plaintiff argues the conditions for coverage were met on the date of the accident. He contends he has permission from the insured, Ms. Fontenot, to use the substitute car, which had been "borrowed temporarily" while the insured Town Car was being serviced.
Prudential argues the car plaintiff was driving at the time of the accident was a rental car and plaintiff was excluded from coverage under the policy while driving a rental car. In support of this position, Prudential points to the section entitled "who is insured in a non-owned car," which states:
You and a resident relative are insured while using a non-owned car. The owner must give permission to use it. It must be used a the way intended by the owner.
Under the section entitled "what cars are covered," a "non-owned car" is defined as:
In addition to substitute cars, we will cover a non-owned car. The owner must give permission to use it. The non-owned car must be used in the way intended by the owner. This includes a rented car for a period of up to 30 consecutive days. The non-owned car has the same coverage as any one of your cars insured with us.
Mr. Delahoussaye testified that part of the incentive when purchasing a Town Car from Lamarque, was that Lamarque provided the customer with a Town Car to use while the car purchased was being serviced or repaired. Mr. Delahoussaye explained that he would contact the service department of the Lamarque dealership to request a loaner car when it was time to bring Ms. Fontenot's Town Car to be serviced. A representative from the service department would call him when a car was available. The day before this accident, Mr. Delahoussaye went to Lamarque to have the Fontenot vehicle serviced, and he was given a Town Car to use while the Fontenot vehicle was being serviced. Given these circumstances, the car Mr. Delahoussaye was driving at the time of the accident falls under the definition of substitute car, i.e. the car was "borrowed temporarily" while the insured vehicle was being serviced, a situation clearly anticipated by the policy language.
Even if we were to find the car Mr. Delahoussaye was driving at the time of the accident was a rental car, rather than a "substitute car," there is an ambiguity in the policy language concerning "non-owned cars." According to our reading of the policy, plaintiff would also be covered under the section defining "non-owned car," which states "the non-owned car has the same coverage as any one of your cars insured with us."
Prudential attempted to limit coverage under the "non-owned car" section of the policy to the insured and a resident relative. However, in attempting to do so, they created an ambiguity. While the section listing which cars are covered states a "non-owned vehicle" has the "same coverage as any of your cars insured with us," a later section attempts to limit coverage to the named insured and a resident relative, making the policy ambiguous as to the coverage applicable to a non-owned car.
*686 The well settled rule of law is that ambiguity in an insurance policy must be resolved by construing the policy as a whole; one policy provision may not be construed separately at the expense of disregarding other policy provisions. Pareti v. Sentry Indemnity Co., 536 So.2d 417, 420 (La.1988). An insurance policy should be construed as a whole and no single portion of an insurance contract should be construed independently of the rest of the policy. Hartford Acc. & Indem. Co. v. Joe Dean Contractors, Inc., 584 So.2d 1226 (La.App. 2nd Cir.1991).
Ambiguous policy provisions are to be construed against the insurer who issued the policy and in favor of coverage to the insured. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993). "Equivocal provisions seeking to narrow the insurer's obligation are strictly construed against the insurer, since these are prepared by the insurer and the insured had no voice in the preparation." Garcia v. St. Bernard Parish School Bd., 576 So.2d 975, 976 (La. 1991).
Clearly, the car being driven by Mr. Delahoussaye at the time of the accident was a substitute car being used while the insured vehicle was being repaired. The policy language quoted above expresses an intent to provide coverage identical to coverage on the insured vehicle, when a substitute car is being used while the insured car is being repaired. The policy does limit coverage on rental cars, but not on substitute cars. Mr. Delahoussaye was listed as a resident licensed driver on the declarations page of the Prudential policy, and was covered under uninsured motorist provisions of the policy while driving Ms. Fontenot's Town Car. At the time of the accident, he was driving a substitute car that was being used temporarily while the covered car was being repaired. This substitute car, given these limited facts, had the same coverage as the insured car. Therefore, Mr. Delahoussaye was covered under the uninsured motorist provision of the Prudential policy. Hence, the trial court erred in finding Mr. Delahoussaye was not covered by the uninsured motorist provision of the Prudential policy at the time of the accident.
Having determined there was coverage under the Prudential policy, we must now determine whether the Liberty Mutual policy or Prudential policy was primary.
Plaintiff argues the Prudential policy is primary based on LSA-R.S. 22:671, which at the pertinent time read:
Automobile liability coverage; loaner vehicle; driver's policy primary policy
A. Notwithstanding any provision of the policy, the primary liability coverage for a loaner vehicle shall be the policy of the driver, not the policy of the vehicle sales or service dealer who provided the loaner vehicle.
B. (1) In this Section, `loaner vehicle' means any vehicle which is provided to an insured driver by a vehicle sales or service dealer for his temporary use as a replacement vehicle while the insured's vehicle is being serviced or repaired. The term shall also mean any vehicle which is provided to an insured driver by a vehicle service or sales dealer for the purpose of allowing the driver to demonstrate or test drive the vehicle.
(2) In this Section, `vehicle sales or service dealer' means any person engaged in the business of selling, repairing, or servicing motor vehicles.
[Emphasis added]
Plaintiff argues this statute mandates there be primary coverage under the Prudential policy in order to effectuate legislative will. We disagree with plaintiff's contention. Section 671 is entitled "automobile liability coverage." Uninsured motorist coverage is not mentioned anywhere in the statute. While Section 671 addresses liability coverage, LSA-R.S. 22:1406 D regulates uninsured motorist coverage, and provides:

*687 (c)(ii) With respect to bodily injury to an injured party while occupying an automobile not owned by said injured party, resident spouse, or resident relative, the following priorities of recovery under uninsured motorist coverage shall apply:
(aa) The uninsured motorist coverage on the vehicle in which the injured party was an occupant is primary;
(bb) Should that primary uninsured motorist coverage be exhausted due to the extent of damages, then the injured occupant may recover as excess from other uninsured motorist coverage available to him. In no instance shall more than one uninsured motorist policy be available as excess over and above the primary coverage available to the injured occupant.
[Emphasis added]
These statutes provide specific ranking order for instances, such as the one at bar, where the injured party is covered under two uninsured motorist policies. When a person injured is occupying a non-owned vehicle, the uninsured motorist policy on the car in which he is riding is primary, while the injured person's own uninsured motorist policy is secondary. Accordingly, we find the uninsured motorist coverage under the Liberty Mutual policy is primary.
In his next section of assignments of error, the plaintiff argues the trial court erred in awarding inadequate general damages and inadequate future medical expenses. In support of these assertions, Mr. Delahoussaye contends his thoracic and lumbar injuries were not present prior to the 1993 accident. Although he was completely disabled by the 1985 accident, Mr. Delahoussaye states he was able to enjoy life and was physically self-sufficient prior to the 1993 accident.
In reviewing a general damage award on appeal, the function of the appellate court is to review the exercise of discretion by the trial court, not to determine what the appellate court considers an appropriate award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The trier of fact is not bound by expert testimony; rather, expert testimony must be weighed just as any other evidence. Bourgeois v. Roudolfich, 580 So.2d 699 (La.App. 5th Cir.1991).
The weight to be accorded to the testimony of experts depends largely on their qualifications and the facts on which they base their opinions. The trial court may evaluate expert testimony by the same principles as apply to other witnesses; it has great discretion to accept or reject medical or lay opinion.
Durkee v. City of Shreveport, 587 So.2d 722, 728 (La.App. 2nd Cir.1991), writ denied, 590 So.2d 68 (La.1991).
Mr. Delahoussaye testified as to his pain and his depressed emotional state, which resulted in his lack of desire to participate in activities with Ms. Fontenot and their daughter. Ms. Fontenot also testified as to Mr. Delahoussaye's depression and lack of participation in family outings, but she also stated that she left him because "unfortunately, the love is not there on my part any more."
Dr. Razza testified that Mr. Delahoussaye's disc condition could have preexisted the 1993, but he felt the 1993 accident caused these conditions to become symptomatic. His testimony was unclear as to what role Mr. Delahoussaye's diabetes plays in his present condition. While Dr. Razza's testimony was clear that he recommended surgery for Mr. Delahoussaye's condition, Mr. Delahoussaye's testimony indicated he did not want to undergo surgery.
Dr. Berman's testimony as to the areas where Mr. Delahoussaye experienced pain prior to the 1993 accident was unclear. Dr. Berman testified that prior to 1993, Mr. Delahoussaye had a "great deal *688 of back pain," and experienced pain in his thoracic area. He further testified that Mr. Delahoussaye has neck and middle back pain and a "little" low back pain. Dr. Berman also eluded to a 1995 fall that resulted in increased low back pain.
Additionally, the report from Dr. Russo states that there was degeneration in the thoracic spine prior to the accident. Dr. Russo also opined that there is no need for future surgery.
We find the trial court award of $75,000.00 in general damages, in light of Mr. Delahoussaye's pre-existing condition, the differences in Mr. Delahoussaye's testimony and Dr. Berman's testimony regarding the location of Mr. Delahoussaye's back pain prior to the 1993 accident, and the conflicting expert testimony regarding the role of diabetes in Mr. Delahoussaye's condition and the need for future surgery, to be appropriate.
Mr. Delahoussaye contends the trial court erred in awarding $50,000.00 in past, present, and future medical expenses in light of the fact that the parties stipulated to $61,449.17 in past medical expenses. This argument ignores the fact that the stipulation states that plaintiff still had the burden of proving that the particular medical expenses were related to the accident. The trial court found that plaintiff failed to carry this burden of proof. We agree. There was testimony as to which type of treatment plaintiff received from which health care providers, but it was unclear whether this treatment was for Mr. Delahoussaye's preexisting condition or for injuries sustained in the accident. The allocation of a portion of the $61,449.17 in medical expenses for treatment of pre-existing condition was not an error by the trial judge. We find the trial judge's award of damages to be appropriate under the facts and circumstances of this case, and we decline to award plaintiff additional damages.
We now turn to the amount plaintiff is entitled to recover under the Prudential policy. In order to collect under the Prudential policy, plaintiff must first exhaust the limits of the Liberty Mutual policy, since the Prudential policy is secondary. Plaintiff received $10,000.00 from the tortfeasor's underlying liability policy. The limit of the Liberty Mutual policy, which is primary, is $100,000.00. The trial court awarded $125,000.00 against Liberty Mutual, giving a credit of $10,000.00 for the settlement with the tortfeasor's insurer. Thus, plaintiff is entitled to recover $15,000.00 from Prudential, as the secondary uninsured motorist carrier.
Finally, we address plaintiff's request for penalties and attorneys' fees from Prudential pursuant to LSA-R.S. 22:1220. This statute provides, in pertinent part:
A. An insurer including but not limited to a foreign line and surplus line insurer owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in subsection A:
* * * *
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
Because this statute is penal in nature, it must be strictly construed. Holt v. Aetna Cas. & Sur. Co., 28,450 (La.App. 2nd Cir. 9/3/96), 680 So.2d 117, writ denied, 96-2523 (La.12/6/96), 684 So.2d 938. An insured's burden under this statute is great and sanctions should be imposed against the insurer only "where the facts negate probable cause for nonpayment," and plaintiff proves the "insurer's actions *689 or failure to act were unjustifiable." Id. at 130.
In refusing to attempt to settle plaintiffs claim, Prudential relied on the policy language that restricted coverage under the rental car provision. Prudential took the position that if it were proven that the car Mr. Delahoussaye was driving at the time of the accident was a rental car, he was not afforded uninsured motorist coverage under the policy. Our jurisprudence has recognized the right of insurance companies to litigate questionable claims without being subjected to damages and penalties. Darby v. Safeco Insurance Company of America, 545 So.2d 1022. Although we disagree with Prudential's position, their litigation of this claim was not arbitrary and capricious. Hence, we decline to award penalties and attorneys' fees.
For the foregoing reasons, the judgment of the trial court dismissing plaintiffs claim against Prudential is reversed. Judgment is hereby rendered against Prudential Property and Casualty Insurance Company and in favor of plaintiff in the amount of $15,000.00, plus interest from the date of judicial demand, costs of court, and costs of this appeal. All other aspects of the trial court judgment are affirmed.
AFFIRMED IN PART; REVERSED IN PART.
NOTES
[1] In his petition, plaintiff alleges Prudential issued a policy of liability and uninsured motorist protection to "petitioner and his wife," testimony at trial brought out that the Prudential policy was issued to plaintiff's concubine, with plaintiff being listed as a licensed driver residing at the residence of the insured.