JUDE G. GRAVOIS, Judge.
lain this motor vehicle accident case, the plaintiffs have appealed the trial court’s granting of the defendants’ motion for a judgment notwithstanding the verdict, resulting in a reversal of the jury’s award of exemplary damages to the plaintiffs. Also, the defendants have appealed the jury’s awards of compensatory damages to the plaintiffs. For the reasons that follow, we reverse the trial court’s grant of a judgment notwithstanding the verdict, render judgment awarding exemplary damages to the plaintiffs, and affirm the jury’s verdict on compensatory damages.

FACTS

At approximately 4:00 a.m. on Saturday, January 13, 2007, Rodney Gonzalez (“Mr. Gonzalez”) was driving a pick-up truck westbound on an elevated section of Interstate 10 in St. Charles Parish when he lost control of his truck, first striking the right guardrail, then proceeding across two travel lanes before crashing the front of his truck into the left guardrail. These impacts left Mr. Gonzalez’s truck inoperable. It came to rest facing against the left *244 guardrail, at an approximately forty-five degree angle, almost totally obstructing the left travel lane |4of the interstate. Mr. Gonzalez, who had been drinking at a bar prior to this accident, left his disabled truck and began walking east on the interstate. Shortly afterwards, an 18-wheeler being operated by Jonathan Mouton (“Mr. Mouton”) traveling in the left lane of the interstate struck the Gonzalez truck. This impact caused the 18-wheeler to jackknife and crash into the guardrail of the interstate. The cab of the 18-wheeler immediately became engulfed in flames. Mr. Mouton was able to escape without physical injuries. However, his passenger, James Thistlethwaite (“Mr. Thistleth-waite”) had difficulty escaping and remained trapped in the flaming cab for a while. He died eight days later at a Baton Rouge hospital as a result of the injuries he sustained in this accident.
Pamela Thistlethwaite (“Ms. Thistleth-waite”), Mr. Thistlethwaite’s only child, filed a survival and wrongful death suit, seeking damages for the injuries her father received in this accident and for her own damages resulting from his death from this accident. Mr. Mouton also filed suit for the damages he sustained as a result of this accident. Mr. Gonzalez and his employer, Veolia Water North America Operating Systems, LLC (“Veolia”) were named as defendants in these suits, as well as Veolia’s insurers, Zurich American Insurance Company (“Zurich”), Lexington Insurance Company (“Lexington”), and National Union Insurance Company of Pittsburgh, Pa. (“National Union”). These suits were consolidated for trial. After settling with Mr. Gonzalez, Veolia and Zurich, the plaintiffs proceeded to trial against Veolia’s excess insurers, Lexington and National Union, seeking compensatory damages, and exemplary damages pursuant to Louisiana Civil Code article 2315.4, over and above Zurich’s policy limits.[1]
| ^Evidence introduced at trial indicated that Mr. Gonzalez was employed by Veolia as a centrifuge operator. He resided in Texas and was sent by Veolia to work at the Valero oil refinery in St. Charles Parish. Veolia provided Mr. Gonzalez with the pick-up truck that was involved in the accident and paid for his hotel room, gas, and other expenses. Mr. Gonzalez worked the 7:00 a.m. to 7:00 p.m. shift at Valero, seven days per week.
Mr. Gonzalez testified that on Friday, January 12, 2007, he left work at Valero at approximately 7:30 p.m. and went to his hotel room in LaPlace.[2] Between 9:00 and 9:30 p.m., he left the hotel and went to the Legends Sports Bar in Jefferson Parish to meet some men that he worked with at Valero. Mr. Gonzalez gave conflicting testimony as to how long he was at the bar. At one point, he testified that he was at the bar for approximately four and a half hours. At another point, he testified that he arrived at the bar at approximately *245 10:00 p.m. and that the accident occurred approximately 15 minutes after he left the bar.[3] It is undisputed that the accident occurred around 4:00 a.m.
Mr. Gonzalez also gave conflicting testimony as to how much he drank at the bar. At one point, he testified that he drank four beers and had four shots of tequila while at the bar. At another point, he testified that he had one drink approximately every half hour while at the bar. He could not remember the size of the shot glasses the tequila was served in; however, when shown a three-ounce shot glass during his testimony, he stated that that was the size of the shot glass the tequila was served in. He admitted that as of the time of the accident, he had not eaten since lunch on the previous day. Mr. Gonzalez denied that he was drunk at the time of the accident, stating that the alcohol he consumed did not affect his | (¡ability to drive. He stated that he never “gave it a thought about whether the amount [he] had to drink may have influenced [his] ability to drive.”
Mr. Gonzalez testified that at the time of his accident, the tire on his truck “didn’t have normal rotation.” He stated that immediately before the accident, he was in the right travel lane going 55-60 miles per hour, and that his right rear tire then “gave out.” He lost control of his truck, hitting the right guardrail, which threw him across the highway into the left guardrail. He testified that he was unsuccessful in his attempts to move his truck after the accident. He stated that it came to rest at a forty-five degree angle to the left guardrail protruding into the left travel lane. He stated that he was “shaken up” after this accident and could not find his cell phone. He testified that after the accident, he kept his truck lights on and also put the hazard flashers on. He then left the truck and started walking back east on the interstate to find help. When he was about fifty yards away from his disabled truck, he saw an 18-wheeler and a small car approaching at the same time. He stated that the 18-wheeler was in the left travel lane, and if it had swerved to avoid hitting his truck, it would have hit the small car next to it. He testified that the 18-wheeler struck his pick-up truck, then “caught fire pretty fast.” He saw the driver run out of the 18-wheeler. He did not know there was someone else in the 18-wheeler.
Mr. Gonzalez testified that an officer on the scene of the accident gave him a sobriety test. He told the officer that he had not been drinking. He explained that for the sobriety test, he had to follow the officer’s pen without moving his head. He then had to stand on one leg. He estimated that the sobriety test took less than one minute to complete. No breathalyzer or blood alcohol testing was performed at the scene. He stated that he took a drug test on Monday, January 15, 2007, which he passed.
|7Mr. Gonzalez admitted to being incarcerated in 1992 for selling cocaine. He also had two prior DWIs. In 2005, he failed a drug test and was fired by Veolia. He was rehired by Veolia in 2006.
Laura Plunkett, Ph. D., who was accepted by the court as an expert in toxicology, pharmacology and pharmacokinetics, testified on behalf of the plaintiffs. Based on Mr. Gonzalez’s testimony of having consumed eight alcoholic beverages over a 4½ hour time period, Dr. Plunkett opined that at the time of the accident, Mr. Gonzalez *246 had a blood alcohol concentration ranging from .09% — .14% grams. Dr. Plunkett explained that these calculations did not take into account that the blood alcohol concentration in an obese person, such as Mr. Gonzalez who weighed 260 pounds at the time, would be higher than in a lean person.
Dr. Plunkett explained to the jury that the majority of studies done on heavy drinkers, ie., persons who consume more than seven alcoholic beverages over a short period of time, have shown that they under-report the amount of drinks they consume. Thus, she opined that Mr. Gonzalez probably had more than eight drinks while he was at the bar. She stated that while Mr. Gonzalez testified that he was at the bar for 4½ hours, he may have actually been at the bar for as long as six hours, since he also testified that he had arrived at the bar at 10:00 p.m. and the accident occurred at 4:00 a.m., which according to his testimony was approximately 15 minutes after he left the bar. Dr. Plunkett testified that based on Mr. Gonzalez’s testimony that he had consumed one drink every half hour while at the bar, he may have consumed as many as 12 drinks. She also testified that her calculations did not take into account that Mr. Gonzalez consumed this alcohol on an empty stomach, which would have resulted in a higher blood alcohol concentration. Dr. Plunkett testified that she most likely underestimated Mr. Gonzalez’s blood alcohol concentration.
|sDr. Plunkett also explained that a habitual heavy drinker can mask the signs of intoxication during a field sobriety test. She testified that the facts that Mr. Gonzalez was speeding, was involved in a one-vehicle accident, and had misrepresented how the accident happened, were indications that he was impaired. She concluded that more likely than not, there was a reasonable degree of certainty that Mr. Gonzalez was intoxicated at the time his truck crashed into the interstate guardrails.
On cross-examination, Dr. Plunkett testified that she used a 1½-ounce shot of tequila, which contains 14 grams of alcohol, to calculate Mr. Gonzalez’s blood alcohol concentration. She explained this was based both on the size of the shot glass shown to Mr. Gonzalez during his deposition and on the Center for Disease Control’s definition of the size of a shot of alcohol as being 1½ ounces. She admitted that if she changed her calculations to his consuming four beers and four one-ounce shots of tequila, then Mr. Gonzalez’s blood alcohol concentration would have been .07% grams at the time of the accident; however, this did not take into account Mr. Gonzalez’s obesity, which would have resulted in a higher blood alcohol level. She also admitted that had she calculated Mr. Gonzalez’s blood alcohol concentration based on his consuming eight drinks over a six-hour period, his blood alcohol concentration would have been approximately .05% — .06% grams at the time of the accident. Dr. Plunkett explained that the reason why she used 4⅜ hours in her calculations was because Mr. Gonzalez consistently testified that he drank for 4½ hours prior to the accident.
Mr. Mouton testified that he had been driving an 18-wheeler for three years at the time of the accident. He was a trainer and Mr. Thistlethwaite was his student. He explained that he entered Interstate 10 westbound at the Interstate 310 interchange. He was initially in the right travel lane, then switched to the left lane because there was a vehicle on the right side of the roadway with its flashers on. JjjHe remained in the left lane and was passing a vehicle when he saw a dark object in the roadway. When he realized *247 the object was a pick-up truck, he hit his brakes and turned right in a failed attempt to avoid hitting the pick-up truck. Mr. Mouton testified that the pick-up truck’s headlights, tail lights, and flashers were not on at the time of the accident. After hitting the pick-up truck, Mr. Mouton stated that he “lost steering,” jackknifed, and hit the guardrail. He immediately saw flames coming out of the engine and told Mr. Thistlethwaite to get out of the truck. Mr. Mouton jumped out of the truck, walked around the back of the truck, and saw flames on Mr. Thistlethwaite. When Mr. Thistlethwaite was finally able to escape the cab of the 18-wheeler, he was on fire. After the flames engulfing Mr. Thist-lethwaite were extinguished, Salvatore Cimino, the motorist whom the 18-wheeler had been passing and who had stopped because of the accident, allowed him refuge and some comfort in his vehicle, both because of the nature and extent of Mr. Thistlethwaite’s burns and the fact that it was cold outside that morning. Mr. Mouton remained with Mr. Thistlethwaite until the ambulance arrived. He then accompanied him in the ambulance to a hospital in Kenner, and then in another ambulance later that morning to a specialty bum hospital in Baton Rouge.
Mr. Mouton testified that Mr. Gonzalez told him at the scene that he was sorry— that he had had a blowout. Mr. Mouton explained to the state trooper on the scene what had happened in the accident. Although Mr. Mouton did not suffer physical injuries as a result of this accident, he presented testimony as to the psychological injuries he sustained as a result of this accident, leaving him unable to resume his occupation as a driver of 18-wheelers.
Michael Gillen, who was accepted by the court as an accident reconstruction expert, testified on behalf of the plaintiffs. Mr. Gillen explained that there was a so-called “black box” in the Gonzalez pick-up truck which indicated that five seconds before it crashed into the right guardrail, it was traveling at 89 miles per | inhour and the driver was braking. Mr. Gillen testified that the right rear side of the pick-up truck struck the right interstate guardrail, which blew out the right rear tire. The truck then veered into the left interstate guardrail, blowing out the left front tire. When the pick-up truck came to rest, it was blocking all but three feet of the left travel lane. Mr. Gillen opined that the rear tire blowout occurred after the right guardrail was struck based on the fact that there was no tire debris found at the accident scene. He explained that had the tire blowout occurred before the truck struck the right guardrail, tire debris would have been found at the accident scene. Mr. Gillen testified that he was retained shortly after the accident and collected data from the scene on March 5, 2007. In his opinion, the state trooper who investigated this accident had limited training. Mr. Gillen explained that he did not rely solely on the information in the police report to reach his conclusions about the accident because there was a lot of information not contained in the police report. He testified that there was not enough time or distance for Mr. Mouton to have avoided impact with the pick-up truck. He testified that Mr. Gonzalez had a duty to stay with his disabled vehicle and warn approaching drivers.
Mr. Gillen testified that the National Highway Traffic Safety Administration lists twenty-four cues, broken into four categories, which are used by police to identify impaired drivers. In his opinion, Mr. Gonzalez exhibited some of these cues, including speeding, failing to maintain control, striking another object, and weaving across lanes. Mr. Gillen testified that based on these cues, there is a 65% proba *248 bility that Mr. Gonzalez was impaired at the time of the accident.
Mr. Gillen noted that there were tire marks at the scene showing fishtailing leading up to the pick-up truck’s impact with the right guardrail. On cross-examination, he admitted that low air pressure in a tire could cause instability of a vehicle and cause a vehicle to fishtail. However, Mr. Gillen testified that there was no indication that the tire on the pick-up truck was underinflated.
In At the conclusion of the plaintiffs’ evidence, the defendants moved for a directed verdict on the issue of exemplary damages. The trial court denied the motion.
The defendants then called Trooper Samuel Boyd, Jr. to the stand. Trooper Boyd testified that he was an officer with the New Orleans Police Department from 2001 to 2004 and had been a state trooper since 2004. He received brief training in accident investigation when he worked for the New Orleans Police Department. He arrived at the scene of this accident at 4:10 a.m. As part of his investigation, he took numerous photographs which were admitted into evidence. He interviewed Mr. Gonzalez and detected an odor of alcohol on his breath. Mr. Gonzalez submitted to a field sobriety test which included the horizontal gaze nystagmus, walk and turn, and the one-leg stand. Trooper Boyd explained that the gaze test is performed two times to determine if there is a lack of “smooth pursuit in each eye” while looking for an involuntary jerking in the eyes. Trooper Boyd stated that if “a subject is impaired — you can’t defeat this test.” For the walking test, the subject is told to walk heel-to-toe and take nine steps forward, turn and walk nine steps back. The subject must hold his hands at his side while performing this test. Next, the subject has to stand with his heels together then raise one leg six inches off of the ground while not raising his arms for balance. Trooper Boyd testified that all of these tests were performed on Mr. Gonzalez and that he did not show any signs of impairment. He explained that any doubts he would have had as to Mr. Gonzalez’s impairment would have been referred to his supervisor who was on the scene.
On cross-examination, Trooper Boyd testified that he performed all of the accident investigation and that other troopers on the scene only performed traffic control. He admitted that this accident caused the highway to be closed down for seven hours. He denied being overwhelmed by this scene. He explained that he rated Mr. Thistlethwaite’s injuries as moderate on the police report because Mr. 112Thistlethwaite was conscious and was able to speak to him. He did not see any evidence of a blowout on the pick-up truck from debris on the roadway.
Trooper Boyd could not recall how long it took him to perform the field sobriety test on Mr. Gonzalez. He was unable to recall whether he stated in a prior statement that he had only performed two of the field sobriety tests on Mr. Gonzalez. He explained that because Mr. Gonzalez passed the field sobriety test, he did not perform a breath or blood test on him to check for blood alcohol concentration. He admitted that the normal procedure is to perform the field sobriety test in front of his police unit in view of the unit’s video camera. He could not recall how his police unit was positioned at the accident scene, but assumed that due to the position of the vehicles, he was unable to perform the test in front of his police unit. He could not recall where he performed the test in this instance. He testified that he asked Mr. Gonzalez if he had been drinking, and Mr. Gonzalez admitted to having “some” drinks. He explained that he usually asks the subject how many drinks were con *249 sumed, but had no record or recollection as to the number of drinks Mr. Gonzalez admitted to consuming. Trooper Boyd could not recall whether he performed the sobriety test when he first arrived on the scene or after he got to the other side of the 18-wheeler. He explained that he did not have any documentation as to the results of the test because the normal protocol is to not document the results of the test if the individual is not arrested.
Trooper Boyd testified that he looked at the scene for witnesses, but did not identify any. He explained that it took him 35 minutes to call for an ambulance for Mr. Thistlethwaite because he did not walk around to the other side of the burning 18-wheeler until that amount of time had elapsed after his arrival on the scene.
Charles Prewitt was accepted by the court as an expert in mechanical engineering and accident reconstruction. He testified that the speed limit where this accident occurred was 60 miles per hour. He estimated that the minimum |13speed of Mr. Mouton’s 18-wheeler was 65 miles per hour prior to the accident and could have been as high as 70 miles per hour. He noted the absence of skid marks by the 18-wheeler, and pointed out that the pickup truck was pushed 50 feet after it was hit by the 18-wheeler, and that the 18-wheeler traveled 170 feet from the point of impact with the pick-up truck. Mr. Prew-itt testified that the flashing from the pickup truck’s hazard lights could have been seen from at least 1,000 feet away, and that an 18-wheeler traveling at 65 miles per hour can stop in 500 feet. He also stated that the reflective elements on the left rear tail light of the pick-up truck could have been seen at a distance of 720 feet. Thus, Mr. Prewitt concluded that the 18-wheeler had plenty time to stop and avoid hitting the pick-up truck.
Dr. William George was accepted by the court as an expert in toxicology and pharmacology. He testified that based on Mr. Gonzalez’s consumption of four beers and four shots of tequila over a six-hour period, he was not impaired at the time of the accident. He explained that he went to the Legends Bar and confirmed that the shot sizes served at Legends contained one ounce of liquor. His calculations were based on Mr. Gonzalez’s consuming four beers and four one-ounce shots of tequila, which contain 9.3 grams of liquor. In his calculations, Dr. George used an elimination of alcohol rate of 17.7 milligrams percent per hour, while Dr. Plunkett used an elimination rate of 13. According to Dr. George’s calculations, Mr. Gonzalez’s blood alcohol concentration was .028% grams at the time of the accident. He testified that Mr. Gonzalez would not have been impaired at the time of the accident relative to his ability to operate a motor vehicle safely.
On cross-examination, Dr. George admitted that he visited the Legends Bar in June of 2009. He stated that although Legends had the same management in place at that time as it did in January of 2007, he did not know if the same bartenders were working as in January of 2007. He testified that the shot glasses used at Legends in June of 2009 were the same as the one depicted in Mr, |uGonzalez’s video deposition. Dr. George clarified that his calculations were based on Mr. Gonzalez’s consuming eight drinks between 10:00 p.m. and 2:30 a.m. He admitted that he did not know what Mr. Gonzalez was doing between 2:30 a.m. and the time of the accident, explaining that Mr. Gonzalez had ample time to bring his blood alcohol concentration down before the accident.
At the conclusion of the testimony, the trial judge and the parties went over the jury charges and the jury verdict form. *250 Following closing arguments, the jury retired to deliberate. During deliberations, the jury returned questions to the court, first asking the court to define “intoxication,” and later asking the court to define “under the influence.” On both occasions, the trial judge referred the jury to the jury charges. The jury then returned with the verdict form completed. It found that Mr. Gonzalez’s negligence was a cause-in-fact of the damages resulting from the accident, that Mr. Gonzalez was not in the course and scope of his duties with Veolia at the time of the accident, that Veolia was negligent for entrusting a motor vehicle to Mr. Gonzalez, and that the negligence of Veolia in entrusting a vehicle to Mr. Gonzalez was a cause-in-fact of the accident. The jury also found Mr. Gonzalez and Veolia to each be 50% at fault in causing the accident. The jury awarded compensatory damages as follows:
To Ms. Thistlethwaite:
For past physical pain and suffering sustained by Mr. Thistlethwaite $2,000,000
For past mental pain and suffering sustained by Mr. Thistlethwaite $1,500,000
For her damages sustained as a result of the death of Mr. Thistlethwaite $ 100,000
Total $8,600,000
To Mr. Mouton:
For past pain and suffering, mental anguish, loss of enjoyment of life | njFor future pain and suffering, mental anguish, loss of enjoyment of life “Fur past and future loss of earnings
$250,000
$150,000
$100,000
Total
$500,000
The jury further found that Mr. Gonzalez was intoxicated while operating a motor vehicle and that his intoxication while operating a motor vehicle was a eause-in-fact of the damages resulting from this accident. The jury then awarded exemplary damages in the amount of $12.5 million to Ms. Thistlethwaite, and $12.5 million to Mr. Mouton.
On April 26, 2011, the trial court rendered judgment granting to Ms. Thistleth-waite and Mr. Mouton the full amount of compensatory damages the jury awarded them, and further awarding $12.5 million in exemplary damages to Ms. Thistleth-waite and $12.5 million in exemplary damages to Mr. Mouton. The exemplary damages were awarded only against Mr. Gonzalez, with the court explaining in its reasons for judgment that exemplary damages could not be assessed against Veolia for negligent entrustment, and also specifically noting that the jury had found that Mr. Gonzalez was not in the course and scope of his employment with Veolia at the time of the accident.
On May 6, 2011, Lexington and National Union filed a motion for a judgment notwithstanding the verdict, or alternatively for a new trial. Following a hearing, and after taking the matter under advisement, the trial court issued a judgment on July 29, 2011 confirming the jury awards of compensatory damages to Ms. Thistleth-waite and Mr. Mouton, and granting the defendants’ motion for a judgment notwithstanding the verdict, thereby denying and dismissing the plaintiffs’ claims for exemplary damages. All parties have appealed this judgment.

\ ^PLAINTIFFS’ ASSIGNMENT OF ERROR

Improper granting of motion for judgment notwithstanding the verdict on the issue of intoxication
In their only assignment of error, the plaintiffs argued that the trial court erred *251 by granting the defendants’ motion for a judgment notwithstanding the verdict with respect to the issue of Mr. Gonzalez’s intoxication, arguing that there was sufficient evidence for a reasonable jury to find that Mr. Gonzalez was intoxicated at the time of the accident, and that in granting the judgment notwithstanding the verdict, the trial court impermissibly weighed the evidence, substituted its judgment of facts for that of the jury, and ultimately usurped the jury’s role as factfinder in the case.
Louisiana Code of Civil Procedure article 1811 provides for and controls the use of a judgment notwithstanding the verdict. A trial court’s authority to grant a judgment notwithstanding the verdict under Article 1811 is limited by the jurisprudence to those cases where the jury’s verdict is absolutely unsupported by any competent evidence. Davis v. Lazarus, 04-0582 (La.App. 4 Cir. 3/8/06), 927 So.2d 456, 461. The strict criteria for granting a judgment notwithstanding the verdict is grounded on the rule that when there is a jury, the jury is the trier of fact. Smith v. State, Dept. of Transp. & Development, 04-1817, 04-1594 (La.3/11/05), 899 So.2d 516.
In ruling on a motion for a judgment notwithstanding the verdict, the trial court considers whether the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable persons could not arrive at a contrary verdict. Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00), 772 So.2d 94 (citing Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986)). The trial court must deny the motion if evidence opposing the motion “is of such quality and weight that reasonable and fair-minded persons in the exercise of |17impartial judgment might reach different conclusions.” Id., at 99. In its consideration, the trial court is not to evaluate the credibility of the witnesses and it must resolve all reasonable inferences or factual questions in favor of the non-moving party. Id. On appeal, the reviewing court considers whether the trial court erred in granting the motion for a judgment notwithstanding the verdict by using the same criteria as the trial court. Id. In other words, the appellate court considers whether “the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict[.]” Id. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. Junot v. Morgan, 01-0237 (La.App. 1 Cir. 2/20/02), 818 So.2d 152.
Consequently, because the grant of a judgment notwithstanding the verdict is limited “to cases where the jury’s verdict is absolutely unsupported by any competent evidence,” we will now consider whether there is any competent evidence in this case to support the jury’s verdict. Cattles v. Allstate Inc. Co., 09-1576 (La.App. 4 Cir. 8/4/10), 45 So.3d 627, 631.
Pursuant to Louisiana Civil Code article 2315.4, a defendant may be cast in judgment for punitive damages “upon proof that the injuries on which the action is based were caused by a wanton or reckless disregard for the rights and safety of others by a defendant whose intoxication while operating a motor vehicle was a cause in fact of the resulting injuries.” Recovery of such damages requires proof: (1) that the defendant was intoxicated or had consumed a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties; (2) that the intoxication was a cause-in-fact of the resulting injuries; and (3) that the injuries were caused by the defendant’s *252 wanton or reckless disregard for the rights and safety of others. Lafauci v. Jenkins, 01-2960 (La.App. 1 Cir. 1/15/03), 844 So.2d 19, 25. Louisiana courts have recognized that a driver’s intoxication may be proven by circumstances even absent a positive alcohol test. Lyons v. Progressive Ins. Co., 08-2163 (La.App. 4 Cir. 7/21/04), 881 So.2d 124, 127, writ denied, 04-2164 (La.11/19/04), 888 So.2d 209. The decision to award exemplary damages under Article 2315.4 rests within the sound discretion of the trier of fact. Khaled v. Windham, 94-2171 (La.App. 1 Cir. 6/23/95), 657 So.2d 672, 681.
In order to prove that a person is incapable of operating a motor vehicle by reason of intoxication, it need not be shown that he was drunk, but only that he had a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties. Level v. Calais & Sons, Inc., 514 So.2d 153, 159 (La.App. 5 Cir.1987). Although blood alcohol content alone is insufficient to establish causation, corroborative evidence other than expert testimony is sufficient to show that alcohol was a causal factor contributing to the accident. McDaniel v. DeJean, 556 So.2d 1336 (La.App. 3 Cir.1990). To determine impairment, the trier of fact must consider the totality of the circumstances. Owens v. Anderson, 93-1556 (La.App. 4 Cir. 1/27/94), 631 So.2d 1313, 1318.
In their respective briefs, the plaintiffs argue that the jury may have considered the following evidence in finding that Mr. Gonzalez was intoxicated at the time of the accident, to-wit:
• Admission of consuming at least eight drinks
. • Drinking at least four shots of tequila from a three-ounce glass
• Lack of sleep
• Drinking on an empty stomach
• Breath smelling of alcohol
• Testifying inconsistently about the rate at which he consumed alcoholic beverages
• “Black box” evidence of speed at least 29 miles per hour over the speed limit
|19* Swerving, losing control, and wrecking his vehicle
• Initially lying to the investigating officer about drinking
• Prior DUI convictions, speeding tickets, and workplace violations
• Estimated blood alcohol content (“BAC”) based on the calculations of expert toxicologists
• Likelihood of under-reporting after a night of heavy drinking
• The fact that alcohol concentration will be higher in an obese person than in a muscular person of the same weight
• At least a 65% probability of impairment based on National Highway Traffic Safety Administration study
• Ability of habitual heavy drinkers to mask outward appearances of intoxication
• Scientific literature revealing that impaired driving occurs when a person has a BAC even below 0.05%
The defendants respond that the only evidence presented of Mr. Gonzalez’s intoxication was pure speculation and was contradicted by the actual findings of Trooper Boyd at the scene.
Our review of the evidence presented indicates that the trial judge erred in granting the defendants’ motion for a judgment notwithstanding the verdict, because reasonable and fair-minded persons exercising impartial judgment could have reached different conclusions. Our examination of the evidence shows that the plaintiffs produced evidence to show that at the time of the accident, Mr. Gonzalez *253 was intoxicated or had consumed a sufficient quantity of intoxicants to make him lose normal control of his mental and physical faculties, his intoxication was a cause-in-fact of the injuries in question, and the injuries were caused by his reckless disregard for the safety of others. Lafauci v. Jenkins, supra.
In support of their claim of intoxication, the plaintiffs introduced portions of the videotaped deposition of Mr. Gonzalez. While Mr. Gonzalez testified that he consumed four beers and four shots of tequila, he also testified that he consumed one drink every half hour. He also stated that he arrived at the bar at | ¡^approximately 10:00 p.m. and the accident occurred approximately fifteen minutes after he left the bar. It is undisputed that the accident occurred at approximately 4:00 a.m. When questioned about the size of the tequila shots, Mr. Gonzalez agreed that the shots were served in a glass the same size as a glass shown to him during his deposition by the plaintiffs’ counsel — a three-ounce glass. However, he never testified as to the amount of tequila in the glass.
The plaintiffs also presented the testimony of Dr. Plunkett, an expert toxicologist, who testified that based on Mr. Gonzalez’s testimony of having consumed eight alcoholic beverages over a 4/é-hour time period, at the time of the accident, Mr. Gonzalez had a blood alcohol concentration ranging from .09% — .14% grams. Dr. Plunkett explained that she used a 1½-ounce shot of tequila, which contains 14 grams of alcohol, to calculate Mr. Gonzalez’s blood alcohol concentration. She explained this was based on the size of the shot glass shown to Mr. Gonzalez during his deposition testimony and the Center for Disease Control’s definition of the size of a shot of alcohol.
Dr. Plunkett further testified that studies have shown that heavy drinkers, i.e., persons who consume more than seven alcoholic beverages in a short period of time, under-report the amount of drinks they consume. Thus, she opined that Mr. Gonzalez probably had more than eight drinks. She repeatedly testified that she most likely underestimated Mr. Gonzalez’s blood alcohol concentration.
The plaintiffs also presented the testimony of Mr. Gillen, an accident reconstruction expert, who testified that the National Highway Traffic Safety Administration lists twenty-four cues which are used by police to identify impaired drivers. Mr. Gonzalez exhibited some of these cues, including speeding, failing to maintain control, striking another object, and weaving across lanes. Mr. Gillen testified that based on these cues, there is a 65% probability that Mr. Gonzalez was impaired at the time of his accident.
12i In support of their position that Mr. Gonzalez was not intoxicated, the defendants presented the testimony of Trooper Boyd, who investigated the accident. He interviewed Mr. Gonzalez and detected an odor of alcohol on his breath. Trooper Boyd testified that he asked Mr. Gonzalez if he had been drinking and Mr. Gonzalez admitted to having had “some” drinks. Usually, Trooper Boyd would have had some notation in his records as to the number of drinks the subject admitted to having, but there was no such notation in this case. While Trooper Boyd explained the typical field sobriety test in detail, he admitted that in a statement given shortly after the accident, he said that he had only administered two of the three parts of the test to Mr. Gonzalez. At trial, Trooper Boyd was unable to recall the amount of time he spent administering the field sobriety test to Mr. Gonzalez. Trooper Boyd testified that normal procedure is to perform the field sobriety test in view of the video camera in his police unit. He *254 had no definitive explanation as to why the test was not performed in view of the video camera in this instance. He could not recall whether he performed the field sobriety test when he first arrived on the scene or whether it was performed after he went to the other side of the 18-wheel-er. He did recall, however, that he performed the field sobriety test when “daylight was starting to come,” which would have been several hours after the accident.
The defendants also presented the testimony of an expert toxicologist, Dr. George, who testified that based on Mr. Gonzalez’s consumption of four beers and four one-ounce shots of tequila over a six-hour period, Mr. Gonzalez was not impaired at the time of the accident. He used the six-hour time period in his calculation because there were six hours between the time Mr. Gonzalez admitted to arriving at the bar and the time of the accident. Dr. George testified that he went to the Legends Bar in June of 2009 and found that the shots served at Legends contained one ounce of liquor. He testified that the shot glasses used in June of | ¾⅞2009 were the same size as the one depicted in Mr. Gonzalez’s video deposition. In his calculations, Dr. George used an elimination rate of 17.7 milligrams percent per hour, while Dr. Plunkett used an elimination rate of 13. According to Dr. George’s calculations, Mr. Gonzalez’s blood alcohol concentration was .028% grams at the time of the accident.
Thus it can easily be seen from the evidence introduced that there was a conflict in the expert testimony as to Mr. Gonzalez’s level of intoxication at the time of the accident. As the trier of fact, the jury weighs the expert testimony, just as it weighs other evidence. Delahoussaye v. Modere, 98-1033 (La.App. 5 Cir. 4/14/99), 733 So.2d 679, 687. The jury had great discretion to accept or reject both expert and lay testimony. Id.
A review of the trial judge’s reasons for granting the judgment notwithstanding the verdict in this case indicates that he impermissibly evaluated the credibility of the witnesses. The trial judge clearly discredited Dr. Plunkett’s testimony and gave more weight to the testimony of Trooper Boyd and Dr. George. The trial judge noted that Dr. Plunkett based her computation on the assumption that Mr. Gonzalez consumed 1.5-ounce shots of tequila, which was contradicted by Dr. George’s investigation that showed that Legends served one-ounce shots of liquor. However, our review of the record indicates that the amount of the tequila contained in the shots consumed by Mr. Gonzalez on the night of the accident was never proven by either side. Rather, Mr. Gonzalez admitted that the shots were served in the shot glass that he was shown during his video deposition, which held three ounces. There was no testimony as to the amount of the tequila contained in the shots consumed by Mr. Gonzalez on the night of the accident. The trial court acknowledged that Dr. George’s determination that Legends served one-ounce sized shots was made by him over two years after the accident.
lasBased on our review of the evidence, there was competent evidence introduced which the jury could have relied on in its credibility determinations and in rendering its verdict. This includes: (1) Mr. Gonzalez’s admission of consumption of at least four beers and four shots of tequila; (2) Mr. Gonzalez’s misrepresentations as to the speed he was traveling, how the accident occurred, and how long he was at the bar; (3) the calculations of Mr. Gonzalez’s blood alcohol concentration at the time of the accident by Dr. Plunkett; (4) Trooper Boyd’s inconsistent testimony as to whether he performed all three portions of the field sobriety test on Mr. Gonzalez, com *255 pared to Mr. Gonzalez’s testimony that only two portions of the tests were performed and the whole test process lasted less than one minute; (5) Trooper Boyd’s inability to explain why the sobriety test was not done pursuant to normal protocol in view of his police unit’s video camera; (6) Trooper Boyd’s inability to state how long after he arrived at the scene he performed the sobriety test on Mr. Gonzalez; and (7) Trooper Boyd’s acknowledgment that Mr. Thistlethwaite was in a car parked at the scene that was not involved in the accident, but his failure to interview the driver of that vehicle.
Given the jurisprudential mandate that a judgment notwithstanding the verdict should only be granted when all facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict and all reasonable inferences or factual questions should be resolved in favor of the non-moving party, we find that the trial court erred in granting a judgment notwithstanding the verdict in this case. Accordingly, the trial court’s July 29, 2011 judgment granting a judgment notwithstanding the verdict is hereby reversed.
We now turn to the defendants’ assignments of error.
\9ADEFENDANTS’ ASSIGNMENTS OF ERROR[4]
1. Employer’s responsibility for exemplary damages
The defendants assign as error the district court’s failure to grant the defendants’ motion for summary judgment prior to trial on the issue of vicarious liability, arguing that under La. Civ.Code Art. 2315.4, an employer is not responsible for punitive damages due to the intoxication of an employee.
In this assignment of error, citing Romero v. Clarendon America Ins. Co. 10-338 (La.App. 3 Cir. 12/29/10), 54 So.3d 789, the defendants argue that the Third Circuit has held that punitive damages cannot be assessed against an employer of an intoxicated driver. The defendants argue that a clear reading of the statute does not impose vicarious liability on employers resulting from the acts of their employees.
A review of the jury’s responses to the interrogatories presented to them in their deliberations clearly shows that the jury found that Mr. Gonzalez was not in the course and scope of his duties with Veolia at the time of the accident. Without a finding that Mr. Gonzalez was in the course and scope of his employment at the time of the accident, there was no finding of vicarious liability against Veolia. Thus, the arguments made by the defendants in this assignment of error are unnecessary and moot.
2. Admission of Dr. Dillman’s testimony
The defendants also assign as error the district court’s allowing Dr. Everett Dill-man to present alleged irrelevant and prejudicial opinion testimony as to the net worth of the non-party corporate parent of Veolia Water North America Operating Systems, LLC.
laJDr. Dillman testified that he did an internet search of Veolia Water North America and found that they were a subsidiary of Veolia Environmental, a French company, with a net worth of over $10 billion in 2009. The defendants argue that *256 the testimony regarding the net worth of a non-party parent company was improper. They argue that Dr. Dillman never determined the net worth of the actual defendant in this case, Veolia Water North America.
Dr. Dillman was accepted by the court as an expert in business economics. The jury was specifically instructed that his testimony was relevant for purposes of punitive damages only, not compensatory damages. Dr. Dillman explained that when he searched for the financial statements of Veolia Water North America on Veolia Water North America’s website, he was directed to the Veolia Environmental website and the financial statements for that entity. Dr. Dillman explained that his role was to give the jury information as to the wealth of the defendants because that is one factor the jury could consider in awarding exemplary damages. The defendants introduced no evidence to controvert Dr. Dillman’s testimony.
Evidence as to the defendant’s current financial condition is relevant and may be considered by the trier of fact in determining the appropriateness of exemplary damages. Bienvenu v. Dudley, 95-0547 (La.App. 1 Cir. 10/3/96), 682 So.2d 281, 285, writ denied, 96-2661 (La.12/13/96), 692 So.2d 1069, and writ denied, 96-2673 (La.12/13/96), 692 So.2d 1070. It is well settled that the wealth of the defendant is one of the factors that the trier of fact should consider in making an award of exemplary damages. Mosing v. Domas, 02-12 (La.10/15/02), 830 So.2d 967, 977. The trial court instructed the jury that the testimony of Dr. Dillman was presented solely for the consideration of exemplary damages.
Because we have determined, infra, that the wealth of the defendants, including Veolia and Mr. Gonzalez, has not played any part in our de novo review | ?fiand determination as to the appropriate amount of exemplary damages to be awarded in this case, we find no merit to this assignment of error.
3. Fault of Mr. Mouton
In this assignment of error, the defendants argue that the trial court erred in finding that Mr. Mouton, a professional truck driver, was free from fault in the underlying accident, arguing that Mr. Mouton failed to keep a proper lookout and avoid striking the stalled Gonzalez vehicle in his path. They further argue that Mr. Mouton was speeding at the time of the accident.
There is no dispute that Mr. Gonzalez’s disabled, abandoned pick-up truck was blocking all but three feet of the left travel lane of the interstate. It is also undisputed that at the time Mr. Mouton was approaching the pick-up truck, there was another vehicle in the right lane next to his 18-wheeler which prevented him from completely entering the right travel lane to avoid hitting the Gonzalez pick-up truck. Mr. Mouton testified that the pick-up truck did not have any headlights, taillights or flashers on at the time of the accident. The driver of the other vehicle, Mr. Cimino, testified that he never saw the pick-up truck. Obviously, had the pick-up truck’s flashers been on as Mr. Gonzalez claims, it seems that at least one of the approaching drivers would have seen them. Further, the plaintiffs’ accident reconstruction expert, Mr. Gillen, testified that Mr. Mouton could not have stopped in time to avoid this accident.
The evidence introduced at trial indicates that Mr. Mouton’s 18-wheeler was traveling anywhere from 60 to 65 miles per hour just prior to the time it struck the Gonzalez pick-up truck. It is undisputed *257 that the speed limit where the accident occurred was 60 miles per hour.
|97Upon review, we find that there is ample support in the record for the jury’s finding that Mr. Mouton was free from fault in causing this accident. Accordingly, this assignment of error is without merit.
4. Negligent entrustment by Veolia
The defendants further assign as error the trial court finding that Veolia negligently entrusted a vehicle to Mr. Gonzalez when, at the time of the accident, he was not on a mission for the vehicle owner, was not acting within the course and scope of his duties, and Veolia did not know he was impaired.
Under the negligent entrustment theory, “the lender of a vehicle is not responsible for the negligence of the borrower, unless he had or should have had knowledge that the borrower was physically or mentally incompetent to drive.” Stokes v. Stewart, 99-0878 (La.App. 1 Cir. 12/22/00), 774 So.2d 1215, 1219 (citations omitted). However, one who entrusts an automobile “to an intoxicated, or otherwise incompetent, driver is responsible for the harm resulting from the incompetent operation of the vehicle.” Id. One who loans a car to another when the lender knows or has reason to know that the borrower is likely to use the car in a manner involving an unreasonable risk of physical harm, because of the borrower’s youth, inexperience, intoxication, incompetence, or otherwise, can be held liable to a third party for damage caused by the borrower. Joseph v. Dickerson, 99-1046 (La.1/19/00), 754 So.2d 912, 916.
The evidence in this case indicates that had it not been for the conduct of Veolia, Mr. Gonzalez would not have been driving the pick-up truck which he left disabled almost totally obstructing the left travel lane of the interstate. At trial, it was established that Mr. Gonzalez had two pri- or convictions for DWI, was dismissed for substance abuse and rehired by Veolia, had speeding tickets, and a ticket for improper passing. In fact, Veolia’s safety manager, Kathy Murray, |2Stestified that had Veolia investigated Mr. Gonzalez’s driving record, he would not have been approved to drive a vehicle owned and/or leased by Veolia. Ms. Murray stated that had a check been performed on Mr. Gonzalez in 2004 before he was terminated, his company vehicle would have been taken away. She further testified that a check should have been done on Mr. Gonzalez in 2005, and had it been done, his vehicle would have been taken away. Moreover, Ms. Murray noted when Mr. Gonzalez was rehired in 2006, he admitted to a DUI on that application. She assumed that “whoever reviewed the application missed the DUI.” In fact, Veolia’s records indicate that research on Mr. Gonzalez’s driving history was not performed until after this accident. Ms. Murray had no explanation as to why such a check had not been performed earlier. She repeatedly stated that had such a check been performed, Mr. Gonzalez would not have been allowed to drive a company vehicle. Further, Mr. Gonzalez’s supervisors testified that although it was against company policy, they had consumed alcoholic beverages and then driven company vehicles. Some of these incidents occurred while in the presence of Mr. Gonzalez.
We find that Louisiana law does not prohibit a finding of negligent entrustment against Veolia in this instance, taking into account the conduct of Veolia in providing a vehicle to an employee with a prior history of two DUI convictions, and substance abuse, along with Veolia’s failure to perform even a minimal investigation to discover this prior history. Accordingly, *258 given the specific facts and circumstances of this case, we find no error in the jury’s finding that Veolia is liable for negligent entrustment.
5. Inflammatory argument by plaintiffs’ counsel
The defendants also argue that the trial court erred in allowing the plaintiffs’ counsel to make cumulative and inflammatory comments which improperly 129exhorted the jury into rendering an unreasonably high verdict on exemplary damages. In this assignment, the defendants argue that the plaintiffs’ counsel used “conscience of the community” arguments to incite “xenophobic bias” against Veolia’s parent company which resulted in the “massive” cumulative punitive damages award of $25 million.
Proper exercise of the trial judge’s discretion to allow or disallow argument of counsel is presumed absent a contrary showing. Kelly v. Riles, 99-601 (La.App. 5 Cir. 12/15/99), 751 So.2d 302, 308. In Abadie v. Metro. Life Ins. Co., 00-352 (La.App. 5 Cir. 4/11/01), 804 So.2d 11, 22-23 (citing Devlin v. Westinghouse Elec. Corp., 96-484 (La.App. 5 Cir. 12/11/96), 686 So.2d 920, 927), this Court outlined a test for the propriety of an argument at trial, holding that propriety “must be determined in light of the facts of the particular matter, the conduct and atmosphere of that particular trial, and the arguments of opposing counsel.” See also, Tingle v. Am. Home Assur. Co., 10-71 (La.App. 3 Cir. 6/2/10), 40 So.3d 1169, 1175-76, writ denied, 10-1580 (La.10/29/10), 48 So.3d 1095, writ denied, 10-1578 (La.10/29/10), 48 So.3d 1095, writ denied, 10-1564 (La.10/29/10), 48 So.3d 1095, writ denied, 10-1563 (La.10/29/10), 48 So.3d 1096, writ denied, 10-1562 (La.10/29/10), 48 So.3d 1096.
In their brief, the defendants cite decisions of federal courts and other state courts, but these non-binding cases fail to adequately support the defendants’ “inflammatory statements” argument, particularly considering the even-handed control the trial judge exercised over the proceedings in this case, the clear jury instructions delivered by the trial judge, and the long history of Louisiana jurisprudence affording “broad discretion” to the trial judge in conducting trials as he sees fit and allowing “great latitude” to counsel when arguing before a jury. Kelly v. Riles, supra. Even when argument or evidence at trial is found to have “appealed] to passion and prejudice,” the trial judge may remedy any inference |3nthat may have occurred through a jury instruction. Id. In such cases, the appellate court must determine whether the jury’s punitive damages verdict was tainted by the improper evidence. Further, where the trial judge sustained objections to the allegedly prejudicial statements and allowed comparable latitude to counsel for both sides, the “corrective action” taken merits deference by an appeals court. Id.; See also, Abadie, 804 So.2d at 22-23 (“The trial court is in a better position than an appellate court to determine possible prejudicial effects resulting from counsel’s argument before a jury, and its rulings will not be reversed absent abuse of discretion.”); Tingle v. Am. Home Assur. Co., supra, 40 So.3d at 1175-76.
Here, we find that the trial judge gave clear jury instructions sufficient to “counteract any adverse effects” of comments by counsel for either side, including instructing that counselors’ statements are not to be regarded as evidence and that no “passion, prejudice or sympathy” for either side should influence the verdict. With these jury instructions, the trial judge gave both sides wide latitude in presenting their respective arguments to the jury, but *259 further maintained control by sustaining and overruling objections from both sides regarding improper argument. For example, the trial judge sustained defense counsel’s mid-sentence objection to plaintiffs’ statement during closing that when the jury returned a verdict, “[tjhere’s going to be a phone call. [The defendants are] going to make phone calls to Boston and New York — The court also sustained plaintiffs’ objection to defense counsel’s attempt to paint plaintiffs’ counsel as an outsider: “He told you in his closing that he had dinner last night with his brother and his father to lead you to believe that he was a resident in this area.” Therefore, by the test set forth in Abadie, the allegedly inflammatory statements by plaintiffs’ counsel do not constitute reversible error. Further, because the cumulative and inflammatory comments complained of have not played any part in our de novo review and |ai determination as to the appropriate amount of exemplary damages to be awarded in this case, we find no merit to this assignment of error.
6. Mouton compensatory damages
The defendants further assign as error the jury’s award of compensatory damages to Mr. Mouton ($250,000 for past pain and suffering, mental anguish, and loss of enjoyment of life, $150,000 for future pain and suffering, mental anguish, and loss of enjoyment of life, and $100,000 for past and future lost wages), arguing that, in the absence of physical injuries, the award to Mr. Mouton was grossly excessive and manifestly erroneous, and was the direct product of the district court’s failure to bifurcate the liability and damages phases of the trial.
At trial, Mr. Mouton testified as to the difficulties he had after the accident. After the accident, he had a lot of trouble sleeping. He was unable to drive at all for several months after the accident. He did not want to talk to anyone, especially his mother because he did not want her to worry. He did not want to participate in any activities — he did not even want to fish. He explained that he had to take medications in order to get better.
Mr. Mouton testified that at the time of the accident, he had been an 18-wheeler driver for three years and was earning approximately $48,000 per year. He testified that he “loved this job.” He stated that he has not been able to drive an 18-wheeler after the accident due to “mental issues” from the accident. While Mr. Mouton testified that he hopes that he can return to driving an 18-wheeler at some undetermined time in the future, there was no testimony at trial as to when that time might be.
Mr. Mouton’s treating psychologist, Dr. Frank Friedberg, testified that he first examined Mr. Mouton about six months after the accident. Dr. Friedberg diagnosed Mr. Mouton as having depression and post-traumatic stress disorder. | saMr. Mouton complained of anxiety and nightmares. He had been living with his girlfriend, but was now living with his parents and working with his father. Dr. Fried-berg testified that over the course of his treatment, Mr. Mouton worked “hard to try to get better.” He testified that he last saw Mr. Mouton in January of 2010. Dr. Friedberg stated that although Mr. Mouton was doing better, he still had post-traumatic stress from this accident. Dr. Friedberg also testified that Mr. Mouton had survivor’s guilt due to the fact of his friend and co-worker was killed in the accident.
The defendants also argue that there is no support in the record for any award of future damages for Mr. Mouton, claiming that Mr. Mouton did not feel the need to go back to his psychologist and was doing *260 well. The defendants contend that Mr. Mouton had no need for future care relating to any trauma he suffered from this accident and that he had “gotten past” the accident.
The defendants’ psychiatrist, Dr. Richard Roniger, testified that he evaluated Mr. Mouton in January of 2009. Although Dr. Roniger testified that Mr. Mouton did not need any further treatment, he acknowledged that he did complain of insomnia. He also testified that on the day he interviewed Mr. Mouton, he reported that he had not eaten anything because he was going to have to talk about the accident.
The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Vast discretion is accorded the trier of fact in fixing general damage awards. La. C.C. art. 2324.1. Thus, the initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. Nat’l Emergency Serv. Inc., 99-0934 (La.10/29/99), 747 So.2d 1085, 1089. Only if the reviewing court determines that the trial court has abused its discretion may the appellate court refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 382 (La.1976).
The testimony introduced at trial indicates that Mr. Mouton suffered significant psychological injuries in this horrific accident and was unable to resume his prior employment. Our review of the record indicates that the evidence clearly supports the jury’s award of past and future damages to Mr. Mouton. The jury did not abuse its vast discretion in making this award. This assignment of error is without merit.
7. Thistlethwaite compensatory damages
The defendants also assign as error the jury’s award of compensatory damages to Ms. Thistlethwaite for Mr. Thistlethwaite’s injuries resulting from the accident ($2,000,000 for past pain and suffering, and $1,500,000 for past mental pain and suffering), arguing that this award was also grossly excessive and manifestly erroneous, and was the direct product of the district court’s failure to bifurcate the liability and damages phases of the trial.[5]
The defendants argue that although Mr. Thistlethwaite’s injuries were very serious, the evidence adduced at trial regarding his pain levels and care he was given shows that he was medicated, heavily sedated, and sometimes unconscious during his treatment prior to his death. Thus, they conclude that the jury’s award for his mental and physical pain and suffering is excessive.
At trial, Mr. Cimino testified that he observed Mr. Thistlethwaite come out of the cab of the 18-wheeler “in flames.” Mr. Thistlethwaite dropped to the ground |S4and rolled to put the fire out. Mr. Cimi-no ran up to Mr. Thistlethwaite and assisted him into his car to warm up while they waited for help. He explained that Mr. Thistlethwaite’s skin was burned away. The record indicates that it took a full 35 minutes after Trooper Boyd arrived on the *261 scene to summon an ambulance for Mr. Thistlethwaite. During this prolonged wait, Mr. Thistlethwaite expressed to Mr. Cimino and Mr. Mouton how much his burns hurt.
A review of the EMS record indicates that Mr. Thistlethwaite suffered burns to his entire face, stating that his eye brows, eye lashes and hair in his nose were all singed. These records also show that Mr. Thistlethwaite’s lips were “sooty” and his palate was gray. These records also state that Mr. Thistlethwaite had burns to his entire right arm, half of his left arm, his chest, back, and both legs.
A review of the emergency room records shows that Mr. Thistlethwaite arrived at a nearby hospital in Kenner at 5:30 a.m. This record rates Mr. Thistlethwaite’s injuries as severe and his pain as 10 of 10. This record specifies that Mr. Thistleth-waite had difficulty breathing, and he suffered mouth and nasal burns, as well as eye burns. He also had smoke inhalation. He told the nurse in the emergency room that his clothing had been burned off of him. Intravenous lines were inserted and he was administered several medications for pain and anxiety. At 6:14 a.m., an endotracheal tube was placed in order to properly ventilate Mr. Thistlethwaite. This tube, which remained in place until Mr. Thistlethwaite died, rendered him unable to speak. At 6:50 a.m., he was transferred via ambulance to the burn unit at Baton Rouge General Hospital.
Mr. Thistlethwaite’s treating physician at the burn unit, Dr. Dhaval Adnvaryu, was accepted by the trial court as an expert in specialty burn care. He testified that Mr. Thistlethwaite suffered burns to 43% of his body, in addition to injuries to his respiratory system due to smoke inhalation. He explained that this traumatic injury to the lungs was devastating and increased the mortality rate and [asrisk of complications and infections significantly. He stated that without the inhalation injury, Mr. Thistlethwaite had a mortality rate of about 30% — 40%, but this increased to 60% — 70% due to the inhalation injury. He explained that the fact that the fire was caused by diesel contributed to the severity of the inhalation injury.
Dr. Adnvaryu also testified as to the excruciating pain suffered by burn patients and the large doses of narcotics needed to manage the pain.
Once Mr. Thistlethwaite was stabilized after the transfer to Baton Rouge, photographs were taken of him. Dr. Adnvaryu explained that these photographs are taken by the burn unit staff to document the initial presentation and to monitor trends during the patient’s treatment. These photographs were introduced into evidence and shown to the jury. They depict the devastating burns suffered by Mr. Thist-lethwaite, along with the various medical equipment required for his treatment. Dr. Adnvaryu examined these photographs and pointed out to the jury which areas were second degree burns and which were third degree burns. Dr. Adnvaryu then went over the extensive treatment rendered to Mr. Thistlethwaite, explaining that he went into shock following the burns. This developed into adult respiratory distress syndrome, then renal failure requiring dialysis. Surgery was scheduled to remove some of the burned skin and clean the wounds; however it had to be canceled because Mr. Thistlethwaite’s condition was not stable. Dr. Adnvaryu explained how the nurses rate the patient’s pain based on the heart rate, respiratory rate, and blood pressure of the patient.
Several nurses who cared for Mr. Thist-lethwaite also testified at trial. These nurses described his daily care, including wound care and dressing changes. They explained that a pain rating of zero does *262 not mean that the patient is not experiencing any pain; rather it means that the pain medications were working. They pointed out that Mr. Thistlethwaite was neither able to speak nor [ ar,communicate his pain due to the severity of his injuries and the numerous medications. In particular, Nurse Sonya St. Romain testified as to the extreme pain she experienced when she suffered burns as a child. She also explained that the sedatives given to Mr. Thistlethwaite could mask the outward signs of pain; however, these sedatives only sedate a patient, they do not control the pain.
As noted above, the role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Youn v. Maritime Overseas Corp., supra. Vast discretion is accorded the trier of fact in fixing general damage awards. La. C.C. art. 2324.1. Thus, the initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. Nat’l Emergency Serv. Inc., supra. Only if the reviewing court determines that the trial court has abused its discretion may the appellate court refer to prior awards in similar cases and then only to determine the highest or lowest point of an award within that discretion. Coco v. Winston Indus., Inc., supra.
The evidence introduced at trial indicates that Mr. Thistlethwaite was on fire when he jumped out of the burning truck. He then had to wait for nearly an hour for medical assistance. It was over two hours after the accident before he received any pain medication. Mr. Thistlethwaite remained conscious during this entire time. While still conscious, he was intubated rendering him unable to speak. He then endured a long ambulance ride to another hospital. Over the ensuing eight days pri- or to his death, he underwent aggressive treatment, including numerous dressing changes, x-rays, and other diagnostic tests, and treatment. There was expert testimony as to the extreme pain experienced by burn patients. Thus, our review of the record indicates the evidence clearly supports the jury’s award of | .^survival damages to Ms. Thistlethwaite. The jury did not abuse its vast discretion in making this award. This assignment of error is without merit.
8. Due process claims as to quantum of exemplary damages
In response to the plaintiffs’ assignment of error, in their appeals, the defendants also assign as error, alternatively, and only in the event that this Court reverses the district court’s granting of the judgment notwithstanding the verdict on the issue of intoxication and liability for exemplary damages, which we have done as set forth above, that the jury’s cumulative award of $25 million in exemplary damages against a single person (Mr. Gonzalez) is abusive and excessive under Louisiana law and the Constitution of the United States, and violates the defendants’ due process rights. The defendants further argue that the trial court erred in failing to grant the defendants’ motion for a new trial as to liability for and the amount of punitive damages. As we have found, supra, that there was sufficient evidence for a reasonable jury to find that Mr. Gonzalez was intoxicated at the time of the accident, and thus it was appropriate for the jury to award exemplary damages to the plaintiffs in this case, we will now address the appropriate amount of exemplary damages that should be awarded to the plaintiffs.
Exemplary damages are given to plaintiffs over and above the full compensation for their injuries for the pur *263 poses of punishing the defendant, of instructing him not to repeat the offensive action, and of deterring others from following the defendant’s conduct. Mosing v. Domas, 02-12 (La.10/15/02), 830 So.2d 967, 978. When a defendant raises a claim that the exemplary damages awarded are grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the appellate court must perform a de novo review. Id., at 973.
laaThe instant defendants raised their due process claim in the trial court; however, the trial court did not consider this claim because it granted the defendants’ motion for a judgment notwithstanding the verdict and vacated the jury’s exemplary damage award. Because the record before us is complete, in the interest of judicial economy, we will make a de novo determination as to the appropriate amount of exemplary damages that should be awarded to the plaintiffs in this case.
An award of punitive damages violates due process when it is “grossly excessive” in relation to “the State’s legitimate interests in punishment and deterrence.” BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). In order to determine whether the amount of exemplary dam ages awarded is appropriate, the following factors must be considered: (1) the reprehensibility of the conduct in question; (2) the ratio between the exemplary damage award and the harm the defendant’s conduct caused, or could have caused; (3) the size of any civil or criminal penalties that could be imposed for comparable misconduct; and (4) the wealth of the defendant. Mosing, 830 So.2d at 973.

Factor 1: The reprehensibility of the conduct in question

The first factor to consider in determining whether the amount of exemplary damages awarded is appropriate is the reprehensibility of the conduct in question. The amount of punitive damages “should neither be viewed in the abstract nor compared with awards from other cases,” but rather should be viewed on the facts and circumstances of the particular case. Id., at 981. Both the United States and the Louisiana Supreme Courts have stated that the purpose of punitive damages is to punish and deter, and thus the damages should be assessed based upon the conduct of the defendant rather than the injuries of the plaintiff, with “degree of reprehensibility” being the “most important indicium of the reasonableness of a bapunitive damages award.” BMW, 517 U.S. at 575-76, 116 S.Ct. 1589; Mosing, 830 So.2d at 974. The inquiry into whether punitive damages are “grossly excessive” thus begins with balancing the reprehensibility of the act against the severity of the punitive damages award. Mosing, 830 So.2d at 981. The Mosing court, following the example set forth in BMW, considered the following “aggravating factors” of “particularly reprehensible” conduct: the type of injury caused or that could have been caused by the conduct; the defendant’s “indifference to or reckless disregard for the health and safety of others”; and the “probability of recidivism.” Mosing, 830 So.2d at 979-81 (citing BMW, 517 U.S. at 575, 116 S.Ct. 1589).
The instant defendants argue in brief that Mr. Gonzalez’s actions on the night in question were “not particularly reprehensible” and thus do not warrant a $25 million punitive damages verdict. However, the defendants’ argument regarding Mr. Gonzalez’s actions is not supported by an accurate recounting of the facts of this case, as decided by the jury. First, the defendants would have this Court believe that Mr. Gonzalez “had a blow out on an elevated *264 expressway” and that Mr. Thistlethwaite’s death was caused in part by “Mouton’s failure to see and avoid Gonzalez’ stationary and disabled vehicle.” These assertions are in direct contradiction to the jury’s findings (and this Court’s findings, supra) that Mr. Mouton was not at fault in causing the accident and that Mr. Gonzalez was intoxicated at the time of the accident.
The court in Mosing considered the actions of an intoxicated driver and upheld a jury award of $500,000 in punitive damages to a plaintiff who was awarded $55,000 in compensatory damages. Mos-ing, 830 So.2d at 971. In Mosing, the driver had one open container violation and five other DWI offenses before the accident in question and had fled the scene of two previous accidents. Id., at 979-80. In the accident before the court in Mosing, the defendant crashed into the plaintiff’s car while speeding through a residential neighborhood as he |4nattempted to flee from another hit and run accident; he then fled on foot with the injured plaintiff still “slumped” in his car, “obviously injured.” Id. The court held that “an exemplary damage award, higher than would ordinarily be affirmed, was warranted” because of the particularly reprehensible conduct of the defendant, “a shockingly unrepentant recidivist drunk driver who ha[d] on more than one occasion displayed a conscious disregard for human life and safety while behind the wheel.” Id., at 981. His prior criminal penalties were ineffective as deterrents, and “[a] high probability of recidivism justifies a higher than normal exemplary damage award.” Id. (citing BMW, 517 U.S. at 579-80, 116 S.Ct. 1589).
The instant defendants argue that Mr. Gonzalez’s actions are less reprehensible than those of the defendant in Mosing, and thus should not be grounds for a comparable punitive damages award. We find, however, that while it is true that Mr. Gonzalez has a less severe behavioral pattern than the defendant in Mosing, the jury in this case, based on the evidence presented, reasonably could have found a behavioral pattern in Mr. Gonzalez displaying potential for recidivism and “disregard for human life and safety.” Mr. Gonzalez testified that he worked a twelve-hour shift, did not eat supper, and went to a bar with coworkers to drink alcohol and shoot pool. He admitted that it was “rare” for him to drink hard liquor and unusual for him to have four shots of tequila. He further stated that he “never gave it a thought to eat” and he “never gave it a thought” as to whether the amount he had to drink may have had an effect on his ability to drive. Mr. Gonzalez testified that he told Trooper Boyd he had not been drinking. He further testified that he told his supervisors and Ms. Murray that at the time of the accident, he was on his way to Valero to assist the overnight centrifuge operator. He did not tell anyone at Veolia that he had been drinking. Further, Mr. Gonzalez’s explanation as to how the accident occurred was contrary to the evidence produced at trial. Mr. Gonzalez claims that he struck the guardrail |41 because a tire blew out on his pick-up truck. However, the testimony at trial indicates that there was no evidence of a blowout before Mr. Gonzalez’s truck struck the right guardrail. Although Mr. Gonzalez testified that he was driving approximately 55-60 miles per hour at the time he struck the right guardrail, the “black box” recovered from his truck indicated he was traveling in excess of 89 miles per hour as he was losing control of his vehicle. Mr. Gonzalez also admitted to two prior DUIs, termination from Veolia previously for testing positive for cocaine, and previous incarceration for selling cocaine. Mr. Gonzalez’s actions, both before and after the accident *265 in question, were indeed very reprehensible.
For the above reasons, the first factor, the reprehensibility of the conduct in question, weights heavily in favor of a significant award of exemplary damages to the plaintiffs.

Factor 2: The ratio between the exemplary damage award and the harm the defendant’s conduct caused, or could have caused

The second factor to consider in determining whether the amount of exemplary damages awarded is appropriate is the ratio between punitive damages and the harm that resulted and/or could have resulted.
The defendants argue that the punitive damage award is grossly excessive principally by comparing the quantum to awards in other cases, but Mosing provides that a punitive damages award “should neither be viewed in the abstract nor compared with awards from other cases,” but rather “with reference to the actual damages awarded and the potential harm that could have resulted from the defendant’s conduct.” Mosing, 830 So.2d at 981.
In the case at bar, the potential for much greater harm was definitely present — Mr. Mouton could have also been killed in the accident, and, according to Mr. Gonzalez’s own testimony, had Mr. Mouton swerved further to try to miss his pick-up truck, the 18-wheeler would have collided with Mr. Cimino’s car, placing |42him in grave danger as well. Further, in terms of additional actual harm done, Mr. Gonzalez’s actions caused a major interstate highway to be shutdown for approximately seven hours, thereby inconveniencing hundreds, if not thousands of motorists.
For the above reasons, the second factor, the ratio between punitive damages and the harm that resulted and/or that could have resulted, also weights heavily in favor of a significant award of exemplary damages to the plaintiffs.

Factor 3: The size of any civil or criminal penalties that could be imposed for comparable misconduct

The third factor to consider in determining whether the amount of exemplary damages awarded is appropriate is the size of any civil or criminal penalties that could be imposed on Mr. Gonzalez for comparable misconduct, commonly referred to as “sanctions for comparable misconduct.” There is no evidence in the record that Mr. Gonzalez faced any serious criminal penalties as a result of his involvement in and actions surrounding this accident. He was not charged with driving while intoxicated. Other than this lawsuit, it does not appear that Mr. Gonzalez was exposed to any civil penalties resulting from his actions in this case. Given that Mr. Gonzalez apparently did not receive any significant criminal or civil penalties resulting from his very reprehensible conduct in this case, this factor also weighs heavily in favor of a significant award of exemplary damages to the plaintiffs.

Factor 4: The wealth of the defendant

Finally, the Louisiana Supreme Court in Mosing instructs courts to consider, when possible, the wealth of the defendant and the exemplary quantum necessary to achieve the purposes of punitive damages awards. Mosing, 830 So.2d at 979. The burden lies with the defense to present evidence on the wealth of the defendant for purposes of exemplary damages, and where the defense fails to do so, as in this Incase, the lack of such evidence “does not necessarily render the amount of the exemplary damages so speculative as to constitute an abuse of discretion where the fact finder has other evidence to consider, such as the nature of the tort.” Id., at *266 979. Here, the defendants did not present any evidence regarding the wealth of Mr. Gonzalez. Rather, the plaintiffs presented evidence as to the wealth of Veolia through the testimony of Dr. Dillman, who was accepted as an expert in business economics. Because defendants failed to present any evidence regarding the wealth of Mr. Gonzalez, which they were not required to, the wealth of Mr. Gonzalez (and Veolia, for that matter), has not played any part of our review and determination as to the appropriate amount of exemplary damages to be awarded to the plaintiffs.

Conclusions as to due process violation

Mr. Gonzalez’s speeding down the interstate with a sufficient amount of alcohol in his system to make him lose control of his mental and physical faculties was undeniably very reprehensible conduct. Further, the actual harm done and the potential for greater harm was indeed very significant, particularly because Mr. Mouton, Mr. Cimino, or both of them, could also have been killed in the accident. Also, Mr. Gonzalez apparently did not receive any significant criminal or civil penalties resulting from his very reprehensible conduct in this case. However, a lower ratio of punitive-to-compensatory damages than that used by the jury is called for nonetheless in this case. Though a 6:1 ratio or higher is acceptable in some cases, the high amount of compensatory damages awarded to Ms. Thistlethwaite and Mr. Mouton in this case goes against the illustrations in Mosing of instances when a higher ratio might be permitted. Although the jury here awarded punitive damages at a ratio lower than that in Mosing, thereby accounting for any variance in the reprehensibility of the conduct in question, the high cumulative 6:1 ratio the jury used here fails the test set forth in that same case |44because the exemplary damages awarded are higher than reasonably required to satisfy the objectives of punitive damages awards: punishment, general deterrence, and specific deterrence. Mosing, 830 So.2d at 978. Accordingly, we find that the amount of exemplary damages awarded by the jury in this case is more than is reasonably required to fulfill the purposes of punitive damage awards. Mosing, 830 So.2d at 978 (quoting BMW, 517 U.S. at 580-583, 116 S.Ct. 1589). As such, based on application of the factors set forth by the BMW and Mosing courts, we conclude that the $25 million dollar total punitive damages award by the jury in this case ($12.5 million to Ms. Thistlethwaite and $12.5 million to Mr. Mouton) violates the defendants’ due process rights.

Be novo determination as to appropriate amount of exemplary damages to be awarded

Continuing with our de novo review, we will now determine and assess constitutionally appropriate exemplary damages awards in this case.
The court in BMW refused to set a “mathematical bright line” for grossly excessive punitive damage awards, and noted that a low compensatory damage award “may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.” BMW, 517 U.S at 582-83,116 S.Ct. 1589.
In Mosing, the court upheld a jury’s punitive damages award that was nine times greater than the compensatory damage award when it failed to find a “shocking disparity” sufficient to “manifest plainly passion and prejudice on the part of the jury.” Mosing, 830 So.2d at 981-82. Because the defendant’s actions of speeding through a residential neighborhood around 7:00 p.m. presented a potential harm much *267 greater than the property damage and temporary bodily injury that resulted, the court reasoned that a 9:1 ratio of punitive to compensatory damages was justified on the facts of that case. Id.
14SIn contrast, the Third Circuit found a ratio of approximately 1 to 1 was appropriate in a case where, like Mosing, an intoxicated driver collided with a vehicle occupied by a single individual. Leary v. State Farm Mut. Auto. Ins. Co., 07-1184 (La.App. 3 Cir. 3/5/08), 978 So.2d 1094, 1102, writ denied, 08-0727 (La.5/30/08), 983 So.2d 900. In Leary, the jury awarded $1,550,000 in general damages and $1,700,000 in punitive damages. Id., at 1097. The court reasoned that a direct ratio was appropriate because no greater harm could have resulted since the sole occupant of the vehicle died. Id., at 1102.
The Third Circuit recently upheld a punitive damages award ratio of 2:1 in Tingle v. Am. Home Assur. Co., 10-71 (La.App. 3 Cir. 6/2/10), 40 So.3d 1169, 1175-76, writ denied, 10-1580 (La.10/29/10), 48 So.3d 1095, writ denied, 10-1578 (La.10/29/10), 48 So.3d 1095, writ denied, 10-1564 (La.10/29/10), 48 So.3d 1095, writ denied, 10-1563 (La.10/29/10), 48 So.3d 1096, writ denied, 10-1562 (La.10/29/10), 48 So.3d 1096. In Tingle, the intoxicated driver of an 18-wheeler sped through a red light and collided with the plaintiffs’ car, killing their two-year-old daughter and injuring both parents. Id., at 1171. The jury awarded approximately $2.5 million in compensatory damages and $5 million in punitive damages. Id., at 1178. The court reasoned that the jury’s award at a 2:1 ratio was appropriate because there was potential for greater harm, namely both parents could also have been killed. Id.

Thistlethwaite exemplary damages

Ms. Thistlethwaite was awarded a total of $3,600,000 in compensatory damages. As discussed in detail supra, there was extensive testimony as to the severe and excruciating pain suffered by Mr. Thistlethwaite prior to his death. Mr. Thistlethwaite was observed to be “in flames” when he came out of the cab of the 18-wheeler. He dropped to the ground and rolled to put the fire out. His skin was burned away. Mr. Thistlethwaite expressed the pain he was experiencing during Ufihis prolonged wait at the accident scene for an ambulance to arrive. Mr. Thistlethwaite suffered burns to his entire face, entire right arm, half of his left arm, his chest, back, and both legs. Due to burns of his respiratory system, Mr. Thist-lethwaite was intubated shortly after arrival at the hospital. He remained intubated, which rendered him unable to speak, until his death. After a short stay in the emergency room, he was transferred to a burn unit where he underwent many days of painful treatment for his injuries. During the course of his hospitalization, Mr. Thist-lethwaite went into shock which progressed to adult respiratory distress syndrome, then to renal failure, which required dialysis. Mr. Thistlethwaite suffered a total of eight days before succumbing to his injuries. In her survival action, Ms. Thistleth-waite was awarded $2,000,000 for her father’s past physical pain and suffering, and $1,500,000 for his past mental pain and suffering. Ms. Thistlethwaite was also awarded $100,000 on her wrongful death claim. Although, as set forth supra, this compensatory damage award is clearly supported by the evidence, it is on the high end, given that Mr. Thistlethwaite’s suffering took place only over a period of eight days. Accordingly, although Mr. Gonzalez’s reprehensible actions caused the pain and suffering and ultimate death of Mr. Thistlethwaite, we find that the high amount of compensatory damages awarded to Ms. Thistlethwaite by the jury in this case calls for a smaller ratio of exemplary *268 damages to compensatory damages than that used by the jury as to the Thistleth-waite case. All factors considered, we find that an award of exemplary damages in the amount of $3,600,000 to Ms. Thistleth-waite is appropriate given the particular facts and circumstances of her ease.

Mouton exemplary damages

Mr. Mouton was awarded a total of $500,000 in compensatory damages. Although Mr. Mouton did not suffer any physical injuries, there was extensive testimony, discussed in detail supra, regarding the effect this accident had on his |47life and the psychological injuries he sustained. Mr. Mouton was a young man at the time of this accident and had just begun his career as a truck driver. Due to the devastating psychological injuries he sustained, he was unable to continue his career as a driver of 18-wheelers and had to seek other employment. However, given that Mr. Mouton escaped this accident without any physical injuries, we find that a smaller ratio of exemplary damages to compensatory damages than that used by the jury is appropriate as to his case. Further, we find that a higher ratio of exemplary damages to compensatory damages than we used in the Thistlethwaite case is appropriate for the Mouton case. All factors considered, including the fact that Mr. Mouton will have to live the remainder of his life with significant psychological injuries sustained as a result of this accident, we find that an award of exemplary damages in the amount of $1,500,000 to Mr. Mouton is appropriate given the particular facts and circumstances of his case.

CONCLUSION

For the foregoing reasons, the portion of the trial court’s July 29, 2011 judgment granting the defendants’ motion for a judgment notwithstanding the verdict as to exemplary damages is hereby reversed. Based on our de novo review, exemplary damages in the amount of $3,600,000 are hereby awarded to Pamela Thistlethwaite, and exemplary damages in the amount of $1,500,000 are hereby awarded to Jonathan Mouton. The July 29, 2011 judgment is affirmed in all other respects.[6] The defendants are cast with all costs of this appeal.

REVERSED IN PART; RENDERED IN PART; AFFIRMED IN PART

. The plaintiffs settled all of their claims against Mr. Gonzalez, Veolia and Zurich prior to trial. Under the terms of the settlement agreement, Mr. Gonzalez and Veolia remained as nominal parties to the litigation, pursuant to the procedure outlined in Gasquet v. Commercial Union Ins. Co., 391 So.2d 466 (La.App. 4th Cir.1980), which held that a plaintiff's release of the primary insurer and partial release of the tortfeasor for less than the full primary limits, but granting a credit for the full primary limits and reserving the right to proceed against the excess carrier, did not release the excess carrier from its liability as the excess insurer. In the instant case, the plaintiffs agreed to limit any further recovery to the available excess insurance policies provided by Lexington and National Union.

. Mr. Gonzalez did not testify at trial. Rather, portions of his videotaped deposition taken on May 31, 2007 were played for the jury and transcribed into the record.

. Mr. Gonzalez testified that he called his wife at 2:30 a.m. to tell her that he was leaving the bar. He initially testified that the accident occurred at about 2:30 or 3:00 a.m., but the record indicates that it occurred around 4:00 a.m.

. Although both Lexington and National Union filed separate appeals in this case, in their briefs they each adopted in full all assignments of error and issues presented by the other for review, including the arguments in support thereof, each referring to themselves as being a "co-appellant.”

. The defendants have not assigned as error the award to Ms. Thistlethwaite of $100,000 on her wrongful death claim,

. Lexington also assigns as error the trial court’s failure to allow Lexington credit for the full amount of all underlying insurance. The plaintiffs acknowledge that they agreed to this credit in the first judgment and conclude that the trial court apparently forgot to include it in the second judgment. Thus, Lexington is entitled to credit for the full amount of all underlying insurance.